**UNITED STATES of America,
Plaintiff,**

v.

**Norman Earl RICHMOND, Defendant.**

**No. 63 C.D.**

United States District Court
C. D. California.

July 24, 1967.

Memorandum Incident to Entry of
Judgment Aug. 21, 1967.

John K. Van de Kamp, U. S. Atty., Robert L. Brosio, David R. Nissen, Asst. U. S. Attys., Los Angeles, Cal., for plaintiff.

Ben Margolis, Los Angeles, Cal., and George T. Altman, Beverly Hills, Cal., for defendant.

## MEMORANDUM OPINION

DELEHANT, Senior District Judge.

On November 16, 1966, an indictment was found, returned and filed by a duly

constituted Grand Jury within and for this court against Norman Earl Richmond (hereinafter referred to generally as "the defendant") as defendant. In and by such indictment, it was and is charged against the defendant that:

"Defendant NORMAN EARL RICHMOND, a male person within the class made subject to selective service under the Universal Military Training and Service Act, registered as required by said Act, and the regulations promulgated thereunder and thereafter became a registrant of Local Board No. 119, said Board being then and there duly created and acting, under the Selective Service System established by said Act, in Los Angeles County, California, in the Central District of California; pursuant to said Act and the regulations promulgated thereunder, the defendant was classified in Class I-A and was notified of said classification and a notice and order by said Board was duly given to him to report for induction into the armed forces of the United States of America on October 18, 1966, in Los Angeles County, California, in the district aforesaid; and at said time and place the defendant knowingly failed and neglected to perform a duty required of him under said Act and the regulations promulgated thereunder in that he then and there knowingly failed and neglected to report for induction into the armed forces of the United States as so notified to do."

Also on November 16, 1966, and upon such indictment, a warrant for the arrest of the defendant was issued out of this court by the Clerk thereof, which warrant was executed by the United States Marshal of this district (through one of his duly appointed and qualified deputies) on November 18, 1966.

On December 19, 1966, pursuant to earlier setting by this court, the defendant appeared in person and by counsel of his own selection, before this court,

the Honorable A. Andrew Hauk, one of the judges of this court presiding, for arraignment and plea, and then and there was arraigned in due form, and pleaded not guilty to the single charge against him made in the foregoing indictment.

Thereafter, and on March 8, 1967, the defendant, in writing, and with the approval in writing of both of his counsel, made and filed herein a waiver of the right to trial by jury, and a request that the court try all charges against him, but without any waiver of the right to request any special findings of fact as provided by Rule 23(c), Federal Rules of Criminal Procedure; subjoined to which was a signed consent by the United States Attorney that the case be tried without a jury, coupled with a tendered waiver by the United States Attorney of the right to request any special findings of fact as provided by Rule 23(c), Federal Rules of Criminal Procedure. Also on March 8, 1967, the court (the present judge presiding), after conference with the attorneys for both parties and with the defendant in person within the presence of, and with the stenographic recording of the proceedings of such conference by, the court reporter, approved the foregoing waiver of trial by jury, of course, with the reservation to the defendant of the right under Rule 23(c), Federal Rules of Criminal Procedure to request any special findings of fact.

Thereafter, and on March 14, 1967 and March 15, 1967, trial of this cause was publicly had to the court, without a jury, John W. Delehant, Senior United States District Judge presiding. In harmony with an informal discussion in open court at the close of the trial, between counsel and the court, counsel for the several parties, as of March 23, 1967, the defendant personally approving as of March 17, 1967, entered into a stipulation in writing, which was lodged in the clerk's office on March 24, 1967, and formally filed therein on March 30,

1967, after the approving order of the judge as of March 24, 1967. A copy of that stipulation appears as a footnote hereto.[1]

1. Following is a copy of the post-trial stipulation adverted to in the body of the opinion:

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff<br><br>vs<br><br>NORMAN EARL RICHMOND, Defendant | No. 63–CD<br><br><br>STIPULATION |

WHEREAS the above entitled matter came on for trial on the 14th day of March, 1967, and continued thereafter on the 15th day of March, 1967, and the case having been tried without a jury before the Honorable JOHN W. DELEHANT, Judge presiding, JOHN K. VAN DE KAMP, United States Attorney, by DAVID R. NISSEN, Assistant United States Attorney, appearing for the plaintiff UNITED STATES OF AMERICA, and GEORGE T. ALTMAN and MARGOLIS and McTERNAN, by BEN MARGOLIS, appearing for the defendant NORMAN EARL RICHMOND, and both parties having rested and the matter being submitted on briefs, and

WHEREAS the Trial Judge, the Honorable John W. Delehant, is planning to depart from Los Angeles and has no present plans of returning at any given time,

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the parties that the said Judge may consider the case and render his decision and judgment in writing not in open court and outside of the presence of the defendant with the same full force and effect as though they were rendered in open court and in the presence of the defendant.

DATED: This 23rd day of March, 1967.

JOHN K. VAN DE KAMP, U. S. Attorney
DAVID R. NISSEN, Assistant U. S. Attorney

By /s/ David R. Nissen
Attorneys for Plaintiff United States of America

GEORGE T. ALTMAN and
MARGOLIS and McTERNAN

By /s/ Ben Margolis
 BEN MARGOLIS

Attorneys for Defendant Norman Earl Richmond

"Having been fully advised by counsel as to my rights, I hereby concur in the foregoing stipulation and waive any right which I may have to appear in open court at the time that the decision and judgment of the Court is rendered.

DATED: This 17th day of March, 1967.

/s/ Norman Earl Richmond
NORMAN EARL RICHMOND, Defendant

IT IS SO ORDERED

DATED March 24, 1967

/s/ John W. Delehant
 United States District Judge

It appears to be appropriate at this point for the writer of this memorandum opinion to make two observations. The first is that, as the judge presiding over the trial, he considers that the striking, through the use of ink, both by the defendant and by his counsel, of the language in the typed form of waiver employed on March 8, 1967 designed to waive the right to request special findings as provided by Rule 23(c) should be liberally construed as operative actually to request such findings generally. The court, therefore, without requiring any further or more explicit demand in that behalf, is announcing herein its factual findings. Secondly, since it is preparing and filing this memorandum opinion, it is incorporating such findings herein, without any formal findings of fact separate and distinct from this memorandum opinion. However, as will presently be obvious, the court's formal announcement of judgment will be made in open court by the judge.

The several exhibits introduced and received in evidence upon the trial have been assembled and considered. The court has had access to a transcript of the testimony received in behalf of the parties, as well as to selected material presented prior to the instant trial in the course of the trial of Criminal Case No. 62 in this court, and has been favored with the exhaustive briefs of counsel, as well as the oral arguments of counsel in the course of the trial.

It is preliminarily observed that the reporter's transcript of the proceedings in the course of the trial fairly discloses such evidentiary issues as were tendered during, as well as at the threshold of, the trial. That record speaks for itself, and is not presently recalled or discussed. References, however, are later and briefly made to some, though not all, reservations of questions (e. g., of relevancy or of materiality) on occasions when the court provisionally and precautionarily received certain offered testimony, to which objection had been advanced.

Norman Earl Richmond is a male person. He was born March 6, 1946 in the community known as Arcadia in the state of Louisiana, United States of America. On March 18, 1964, he was, therefore, eighteen years, twelve days of age. He was five feet and seven and three-eighths or eight inches tall, and weighed one hundred forty pounds. He then resided at 1920 West 95th Street, Los Angeles, California.

On March 18, 1964 the defendant executed, signed and filed a Selective Service System Registration Card (SSS form No. 1, revised March 14, 1962). His local board in the Selective Service System was "Local Board No. 119, Los Angeles County, 14911 Crenshaw Boulevard, Gardena, California. By that local board, a Selective Service System Classification Questionnaire was, on April 15, 1964, transmitted to him by United States mail at his place of residence, supra. He timely received that questionnaire; and thereafter and on April 24, 1964, returned it to Local Board No. 119. In it, as returned, and among other things, he identified the date and place of his birth, his name, height (specifying five feet, seven and three-eighths inches), weight, and place of residence as already disclosed, supra; identified a telephone number through which he might be reached, his Social Security Number, the name and address of a woman who would always know his address (incidentally, but immaterially, a person with a name different from that of a woman mentioned for the same purpose on his registration card); stated that he had never been married; identified as members of his immediate family his 38 year old father, his 39 year old mother, and his two sisters respectively 16 and 14 years of age; stated that he had graduated from high school; denied conviction of any criminal offense "other than minor traffic violations" (a phrase, in the printed form, not of his insertion); and disclaimed being a sole surviving son of a family of which one or more sons or daughters were killed in action or died in line of duty while serving in the nation's armed services, or subsequently died of injuries received or disease incurred in such service. Besides those statements, he left

uncompleted and quite blank the spaces involving (a) any military record, (b) marital status and dependency, (c) occupation (note, however, that in his registration card he had declared that he was a "student L. A. C. C.," presumably meaning "Los Angeles City College"), (d) agricultural occupation, (e) all questions touching any claim of status as a minister of religion, or as to preparation for that occupation, (f) all questions oriented to the status of a conscientious objector, (g) all questions touching education, except his graduation from high school, and current college attendance, *supra*, (h) all questions touching alienage, and (i) all questions touching possible disqualification for military service by reason of physical or mental infirmity. He volunteered no information in the spaces inviting such information generally. He executed that questionnaire on April 23, 1964.

On May 4, 1964, the defendant's status was considered by a three member panel of Local Board No. 119, and he was classified as in Class 1–A, that is, subject to military service, by the unanimous vote of the panel. And on May 6, 1964, notice of such action was sent to him through United States mail by Local Board No. 119.

On August 14, 1964, Local Board No. 119, on SSS Form 223, by mail directed the defendant to present himself for Armed Forces Physical Examination to the Local Board, by reporting at "L. A. Examining and Induction Station 1033 South Broadway, Los Angeles, Calif." on September 18, 1964 at 7:30 A.M. He received the Notice and complied with it; and upon examination, was "found fully acceptable for induction into the armed forces," and Local Board No. 119 was promptly so notified. So was the defendant on October 6, 1964.

Through obvious inadvertence, Local Board No. 119 again, and on August 11, 1965, transmitted by mail to the defendant another notice on SSS Form 223 directing him to present himself, that time on August 28, 1965, at 7:30 A.M., at the same "L. A. Examining and Induction Station" for Armed Forces Physical examination. The defendant duly received that notice, but, instead of reporting as it directed, transmitted on August 24, 1965 a statement which Local Board No. 119 received on the same day, in which he said, "I do not wish to take the physical examination on 8–28–65 because I have already had one" signed "Norman Richmond 8–24–65, 4–119–46–158", which is his Selective Service number. On August 27, 1965, Local Board No. 119, by its clerk, transmitted the following letter to the defendant:

" August 27, 1965 4–119–46–158

Norman Earl Richmond
1920 W. 95th St.,
Los Angeles, California

Dear Sir:

" This is to advise that your Order to Report for Examination on August 28, 1965 has been cancelled.

" When your number is reached for Induction, if you are still classified as available, you will be ordered to Report for Induction on the basis of the Statement of Acceptability (D.D. Form 62) which was mailed to you after your examination at 18 years of age.

Very truly yours,

By Direction of the Local Board

Clerk "

On September 13, 1965, Local Board No. 119 reexamined the defendant's classification in the light of a then presented certificate of the Dean of Student Personnel, Los Angeles City College, which indicated that as of that date the defendant was "entered upon and satisfactorily pursuing a full-time course" in that institution; and by an unanimous three member panel vote, reclassified him as 2S, that is, in a deferred student classification, until October, 1966, on condition, however, that he continue meanwhile satisfactorily to pursue such full-time course, and on September 15, 1965, so notified the defendant on SS Form 110. However, on December 20, 1965, Local Board No. 119 received a further report from the Dean of Student Personnel, Los Angeles City College, wherein it was declared that the defendant was then pursuing only a part time course, and as of November 9, 1965 had "dropped to 8½ units."

Thereafter, on January 4, 1966, Local Board No. 119 reclassified the defendant in Class 1–A, and on the following day so notified him by mail on SSS Form 110. As of January 15, 1966, by letter then dated, and received by Local Board No. 119 on January 17, 1966, the defendant addressed to the Local Board, a request in this language: "Dear Sir: I would like to request a personal interview concerning my draft status. Norman Richmond" To that request, by direction of the Local Board, its clerk, on February 21, 1966, addressed and transmitted to the defendant, by mail, a letter, of the body of which the following is a copy:

"Dear Sir:

" Your request for a personal appearance before your Board is acknowledged.

" We have made an appointment for you to appear before your local board at the address given above at 11:00 A.M. on March 1st, 1966.

" Section 1624.2(b) of the Selective Service Regulations provides that 'At any such appearance, the registrant may discuss his classification, may point out the class or classes in which he thinks he should have been placed, and may direct attention to any information in his file which he believes the local board has overlooked or to which he believes it has not given sufficient weight. The registrant may present such further information as he believes will assist the local board in determining his proper classification. Such information shall be in writing, or, if oral, shall be summarized by the registrant and, in either event, shall be placed in the registrant's file.'

BY DIRECTION OF THE LOCAL BOARD

(signed) Margie S. Sellers,

Clerk "

---

The defendant appeared before a panel of three members of the local board on March 1, 1966. Of the ensuing conference, the following summary was made in behalf of the Board, and entered in typewritten characters in the registrant's file before the Local Board.

"Summary of Personal Appearance of Norman Earl Richmond 4–119–46–158 Board meeting held on March 1, 1966.

Board members present, Mr. Doyle Wheeler, Mr. Jack Dameron, Mr. Robt. McGurk.

Registrant sworn in by Board member.

Registrant stated he was no longer in school, had dropped out[2] to work to help out at home as both Mother and Father had had major surgery, father makes about $80.00 per week as a sand tester at a foundry in Pomona. Registrant stated he makes about $10.00 per house, works with uncle contracting work such as putting in windows, doors, etc. Also sings in night club, has made one record, going to make another. Board member asked if family objected to his being drafted, registrant stated he didn't think so. Stated that a lot of his people fed "(sic)" this isn't their country. Board member explained that color meant nothing here, he had a duty to his country and would get every fairness as an American.

Consensus (sic) of Board Classify I–A after PA

Notes by P. H. Mateer　　　　　"

During his personal appearance on March 1, 1966, there was personally handed to the defendant an SSS Form 118. That is a form for the registrant's use in making a dependency claim, which is called a "dependency questionnaire." It was not then or thereafter completed or filed by the defendant. If it had been so filed and returned, a further reexamination of the defendant's classification would thereby have been precipitated.

At the session of the panel of Local Board No. 119 held on March 1, 1966, supra, and following the defendant's personal appearance, supra, his classification was again considered and, by unanimous vote, he was retained in Class I–A, supra. And on March 2, 1966, he was notified in writing on Form 110 of such classification. He actually received that notification on March 2, 1966.

On March 13, 1966 (see covering envelope) the defendant wrote, and by United States mail transmitted, to Local Board No. 119 a handwritten letter, which was received by the Local Board on March 14, 1966, of which the following is a complete copy:

2. That, in point of fact this board recorded declaration by the defendant that he had "dropped out" of college before the board's conference with him on March 1, 1966 is factually true, there is no doubt. In his Selective Service file with Local Board No. 119 is a report of the Dean, Student Personnel of Los Angeles City College, received by such Local Board on April 7, 1966, in which it is declared that he had "terminated his enrollment," with the supplemental memorandum that he "Withdrew. Effective 1–28–66" He had, therefore, withdrawn from the col-

lege some thirty-one days before his appearance for the conference. The Dean's report, though received by the Local Board after March 1, 1966 serves factually to verify the statement of that date attributed to the defendant himself. Besides, it was received by the Local Board and a part of the defendant's Selective Service file before and on April 28, 1966, on which date the Appeal Board acted on the defendant's eventual appeal to it, and confirmed his classification as I–A, (vide infra).

"

I–A Norman E. Richmond
(119) 1920 W. 95th St.
Los Angeles 47, Calif.
757–3868

Dear Sir:

I received your selective service notice of classification #4–119–46–158 date March 2, 1966, classifing me Norman E. Richmond (slave name) in Class I–A presumably for the purpose of determining my fitness or qualifications to be in the armed defence or armed forces or army of the Government of the United States of America.

Could you please answer the follow question for me. Why have I been taught from birth to Love my Enemy and to 'Turn the other cheek' and 'Thou Shall Not kill.' here in America. But now you say I am qualified to serve in the armed forces and possibly lose my one and only *life* in the defense of your country.

(2) I have attended Jr. College and have otherwise performed burdens of government which includes paying taxes, education, following your culture, community improvement. I have fell in line and acted like most of my other Uncle Tom, deaf, dumb, and blind brothers (the your-called Negro's—or niggers) here in the wilderness of North America.

But in the last few years I have been thinking and researching on my status in the framework of the U. S. government and my foreparents were chattel slaves and brought to America kidnaped is a better word against their will and never at any time willingly or with their consent agreed or accepted the status of citizens in the government.

I felt like a fool when I was awakened to the fact that I have been duped into thinking I am a citizen.

Again, my people never at any time willingly with their consent (3) agreed or accepted the *status* of *citizen* in this U. S. GOVERNMENT and the present burdens of government and citizenship forced upon me through birth in captivity does not legally qualify me to perform military service and I firmly believe that the ends of justice will be served if I am first allowed self determination in this matter and not have burdens of government forced on me.

Thank you

Norman E. Richmond "

————◆————

And on March 14, 1966 (see covering envelope) the defendant wrote, and by United States mail transmitted to Local Board No. 119 a communication received by such Board on March 15, 1966, of which a copy follows:

"Dear Sir 4–119–46–158 I–A* (119)

I would like to appeal my classification.

Thank you

Norman E. Richmond "

On its receipt, the foregoing communication was, by the Local Board regarded as an appeal of the defendant's classification within Class I–A, and so noted on its record of minutes in his file. On March 21, 1966, the defendant's Selective Service file before the Local Board was, by that Board, forwarded to the Appeal Board for the Selective Service System in the Southern Federal Judicial District of the State of California, Panel No. 3, at 1206 South Maple Avenue, Los Angeles, California. (Parenthetically, as of March 15, 1966, when the defendant's notice of appeal was received by Local Board No. 119, the locations of that Local Board and of the place of residence of the defendant were both within the territorial area of the then Southern Federal Judicial District of California, of which, by legislation shortly thereafter effective, division was made with the consequence that both of such locations are now within the territorial area of this judicial district, that is to say, the Central District of California. The Appeal Board to which the defendant's record was thus transmitted was and is the Appeal Board having jurisdiction over appeals from Local Board No. 119).

On April 28, 1966, the foregoing Appeal Board, four members participating, considered the appeal last above mentioned and, by the unanimous vote of the participating members, classified the defendant in Class I–A, and so notified Local Board No. 119, by which Local Board such notification was received on May 3, 1966, along with the return to such Local Board of the defendant's Selective Service file.

Also on May 3, 1966, Local Board No. 119, by United States mail, using Form 110, notified the defendant in writing of such action of the Appeal Board.

On May 17, 1966, on SSS Form 252, Local Board No. 119 in writing notified and ordered the defendant to report for induction into the Armed Forces of the United States at Los Angeles Examining and Induction Station, 1033 South Broadway, Los Angeles, California on June 14, 1966 at 7:30 o'clock A.M.

But on May 20, 1966, the Local Board Group F, comprising Board No. 119, among other Local Boards, received from the Chief of the Evaluation and Placement Branch of VISTA a telegram declaring that the defendant "has accepted Vista invitation to begin training on June 21st 1966 at the University of Maryland, Baltimore, Maryland. Mr. Richman "(sic)" will train for six weeks and then be assigned as a Vista volunteer to serve for one year plus the training period;" and requesting that consideration be given the defendant "to permit him to serve in our nation's war on poverty." And on May 26, 1966, Local Board No. 119 received through the United States mail a handwritten letter from the defendant in this language:

"Dear Sir:

I have been selected to be a volunteer in (Vista) in service to America for one year. I am to report June 21 for a six week training program to be conducted by University of Maryland, Baltimore, Maryland.

I applied for (Vista) in Jan. 66 while attending Los Angeles City College. I have submitted proof in a form sent to me by John Hutchison (sic) Chief and Placement Selection Div (Vista)' (sic).

I would like to know if it is possible for me to go in (Vista) as I have been selected to report June 21.

I have be "(sic)" called for induction June 14.

Thank you

Norman Richmond "

---

With that communication was also received some publicity respecting the agency named, "Vista."

On June 7, 1966, Local Board No. 119, by the unanimous vote of its then acting three member panel voted to direct the defendant to report for induction as ordered. And, also on June 7, 1966, that Local Board caused the sending to the defendant of a letter in this language:

" June 7, 1966
Norman Earl Richmond, 4–119–46–158
1920 West 95th Street
Los Angeles, California 90047

Dear Sir:

This will acknowledge receipt of your communication relative to your Selective Service Status. The information contained therein has been considered by this board and it is of the opinion that the facts presented do not warrant the postponement of your induction. You must report as ordered for induction on June 14, 1966.

Very truly yours,

BY DIRECTION OF THE LOCAL BOARD

Patricia H. Mateer, Clerk "

---

Also on June 7, 1966, Local Board No. 119 transmitted by United States mail to the office of (Vista), Washington, D. C., for the attention of the writer of that agency's telegram of May 20, 1966 to the Local Board (*supra*) a brief letter acknowledging receipt of the telegram of May 20, 1966, and imparting to (Vista) the same information communicated to the defendant in the letter to him last above quoted.

Meanwhile, the defendant sought, through proceedings for a Writ of Habeas Corpus, to intercept and prevent his induction into the Armed Forces of the United States; but on or prior to October 14, 1966, such relief was denied by this court wherein it was pending.

Thereupon, and as of October 14, 1966, California Selective Service System, Southern Area Headquarters, by United States mail, so advised Local Board No. 119, and also informed such Local Board of the availability of October 18, 1966 at 7:30 A.M. as a time for the defendant to report for induction. And on October 14, 1966, by Special Delivery, United States mail, Local Board No. 119, transmitted to the defendant the following notice:

"October 14, 1966 SS No. 4–119–46–158

Mr. Norman Earl Richmond
1920 West 95th Street
Los Angeles, California 90047

Dear Sir:

We have been advised by the United States Attorney that your case has been heard on a writ of habeas corpus and that the writ was denied. Therefore, the date of October 18, 1966 has been set for you to report for the continuing Induction processing under the outstanding Order to Report, at 7:30 A.M., 1033 South Broadway, Los Angeles, California.

Very truly yours,

BY DIRECTION OF THE LOCAL BOARD

SPECIAL DELIVERY Lillian M. Lamb, Coordinator"

Though so notified, the defendant failed to, and did not, report for induction, or for any other purpose at the time and place thus directed. Nor has he since reported in any way.

By Title 50 App., U.S.C., section 453, it is declared that:

"Except as otherwise provided in this title * * * it shall be the duty of every male citizen of the United States * * * who on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder."

By Title 50 App.U.S.C., section 454, it is provided that:

"Except as otherwise provided in this title * * * every male citizen of the United States * * * who is between the ages of 18 years and 6 months and 26 years, at the time fixed for his registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to section 3 of this title (section 453 of this Appendix)" *vide supra* * * * "shall be liable for training and service in the Armed Forces of the United States: *Provided,* That each registrant shall be immediately liable for classification and examination, and shall, as soon as practicable following his registration, be so classified and examined, both physically and mentally, in order to determine his availability for induction for training and service in the Armed Forces."

By Title 50 App.U.S.C., section 462, it is provided, *inter alia,* that:

"Any member of the Selective Service System or any other person charged as herein provided with the duty of carrying out any of the provisions of this title * * * or the rules or regulations made or directions given thereunder, who shall knowingly fail

or neglect to perform such duty * * or who otherwise evades or refuses * * * service in the armed forces or any of the requirements of this title * * * or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title * * * or rules, regulations or directions made pursuant to this title * * * shall, upon conviction in any District Court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,-000, or both.

Touching United States citizenship, it is provided by Title 8 U.S.C., section 1401(a) (1), that:

"(a) The following shall be nationals and citizens of the United States at birth:

(1) a person born in the United States, and subject to the jurisdiction thereof."

Indeed, Section 1 of the Fourteenth Amendment of the Constitution of the United States, since its adoption, dominant upon the question, is couched in this language:

*"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."* (emphasis added)

Obedient primarily to that unequivocal constitutional language, but also to the lately quoted Title 8 U.S.C., section 1401(a) (1), it has consistently been held judicially that one born in the United States and subject to its jurisdiction is, from birth, a citizen of the United States; that such citizenship does not depend upon like citizenship of his or her parents, or of either of them (except in the case of the children of ambassadors etc.); and that upon the

subject, his or her color or racial origin is immaterial. United States v. Wong Kim Ark, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890; Perkins v. Elg, 69 App. D.C. 175, 99 F.2d 408 (modified on other grounds 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320); In re Gogal (D.C.Pa.) 75 F.Supp. 268; Elk v. Wilkins, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643; Slaughter-House Cases, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394.

It results that, despite his personally advanced contention to the contrary,[3] Norman Earl Richmond is and, continuously since his birth on March 6, 1946, has been a citizen of the United States. Any other view of his status is simply intolerable and squarely repugnant to the cited and pertinent constitutional and statutory provisions.

The defendant, as a citizen of the United States, was, accordingly, obliged under Title 50 App.U.S.C., section 453, *supra*, to "present himself for and submit to registration" under the Universal Military Training and Service Act, Title 50 App.U.S.C., section 451, et seq. He did so present himself and submit to registration in unquestioning, and unquestioned, compliance, to that extent, with the requirement of the statute.

In view, also, of the date of his birth and of his resulting age, *supra*, the defendant, by virtue of Title 50 App.U.S.C., section 454, at the time of his registration was, ever since has been, and still is, a person "liable for training and service in the Armed Forces of the United States." And, in consequence of his place of residence, once registered, he was and still is a registrant within the jurisdiction of Local Board No. 119, which was a "Board then and there duly created and acting under the Selective Service System established by" the Universal Military Training and Service Act "in Los Angeles County, California," within this Federal Judicial District.

---

3. The court considers that it should deal with the defendant's individual challenge of the reality of his citizenship, and does so respectfully, though without assent.

His advancement of that position is manifestly responsive to ideas or contentions to which he has been exposed in the course of his personal associations.

So far in respect of the defendant's legal obligation to register and liability for training and service in the Armed Forces of the United States. That he did so register, and, at least inceptively, enter into participation in the classification and selection process is made certain from the factual narrative earlier in this memorandum opinion set out. In fact, he pursued such classification and selection process to its final issue. That pursuit is not nullified or obviated by the circumstance that, after his classification, selection and final order to report for induction into the Armed Forces of the United States, he knowingly failed to obey that final order, *infra.*

His classification, selection and order and notice to report are briefly but not repetitively recalled. He received, and answered and returned, his classification questionnaire. On being classified in the first instance in Class I–A and receiving notification thereunto, he reported for and underwent his Armed Forces Physical examination, wherein he was found acceptable, as he was timely notified in writing. Later, upon a showing by him, and with the support of evidence in his behalf he was granted a deferred 2–S classification for a limited and specified period, and was so notified by Local Board No. 119. Shortly thereafter, his educational pursuits having first been diminished, and later abandoned, he was again classified in Class I–A. Upon being notified in writing of that reclassification, he sought and was granted a personal appearance. The personal appearance or conference was held and, at its completion, he was confirmed in Class I–A by his Local Board, and was so notified in writing. He immediately tendered an appeal from that classification. His appeal was submitted. Upon its consideration the Appeal Board, by unanimous vote, adhered to his classification in Class I–A, and made report accordingly to the Local Board. His Local Board thereafter selected him for induction into the Armed Forces, and entered an order for induction. His brief and fruitless effort to obtain assignment to "Vista," with some support from that Agency, ensued; but that request was not granted, and he was promptly so advised. Thereupon, the defendant sought, without success, to intercept through a Writ of Habeas Corpus his induction into the Armed Forces of the United States. Upon its notification of the denial to the defendant, by this court to which he had resorted, of a Writ of Habeas Corpus, the Southern Area Headquarters of California Selective Service System, by and through the military officer in charge of its administration, in writing on October 14, 1966, advised Local Board No. 119 to that effect, and suggested October 18, 1966 at 7:30 A.M., and 1033 South Broadway, Los Angeles, California, as the time and place for the defendant's report for induction. Also, on October 14, 1966, by direction of Local Board No. 119, and in its name, the defendant was directed and ordered by letter sent through United States mail "to report for the continuing Induction processing under the outstanding Order to Report, at 7:30 A.M., 1033 South Broadway, Los Angeles, California." He did not report at the time or place so prescribed, or at any other time or place.

Upon the record of pleadings and evidence under consideration, it is also found by this court that the failure of the defendant so to report for induction into the Armed Forces of the United States in pursuance of the Local Board's order and notice to that end occurred knowingly, within the meaning of Title 50 App.U.S.C., section 462, *supra,* and of the indictment in this case. The entire conduct of the defendant incident to his classification, selection and order to report for induction serves inescapably to demonstrate his determination, if possible, to prevent his induction into the Armed Forces of the United States. In that behalf mention is now made of his communications with his Local Board, including, but without limitation to, his oral declaration to the Local Board in the conference of March 1, 1966, and his letters severally received by the Local

Board on March 14, 1966 and May 26, 1966. Notice is also taken of his effort to obtain entry into "Vista." It is certainly true that there was nothing unlawful about that effort. Still, it may not be understood apart from the context of his then imminent induction into the Armed Forces of the United States, for the interception of which it was quite obviously a diversionary venture. And there is, finally, his resort to this court for the protective shelter of a Writ of Habeas Corpus. It may not be rationally or honestly contended, in the light of the evidence, that he did not proceed knowingly in his failure to obey the order to report for induction. The court finds that the evidence proves beyond a reasonable doubt that he did so proceed knowingly, perhaps by way of *dernier resort*, but knowingly nevertheless. His failure to report was a knowing and deliberate pursuit of the "self determination in this matter," and avoidance of the "burdens of government" of which he had so recently theretofore written in the final sentence of the letter from him, which he transmitted to Local Board No. 119 on March 13, 1966, and the addressee received on March 14, 1966.

The sequence of events in the defendant's registration, classification, selection, and orders or order to report for induction, as already set out in this memorandum opinion, is supported by, and reflected in, the defendant's file in the office of Local Board No. 119 introduced and received in evidence upon the trial herein before the court as Plaintiff's Trial Exhibit 1. The court does not understand the defendant seriously to challenge the mere fact of the occurrence of any of those events; but it readily understands that, for asserted reasons advanced during the trial and in his subsequent brief, he denies the operative validity of some, perhaps all, of such events, and ultimately of his classification, selection and order to report for induction into the Armed Forces of the United States. As briefly as their nature and the technique of their tender allow, the court next adverts to those challenges. So doing, it presumes to consider once, and, without needless repetition, each individual objection, in the asserted impact upon more than one aspect of the defendant's Selective Service System process.

Throughout the trial, (and also by items of evidence received in the slightly earlier trial before this court with a jury, the writer hereof presiding as judge, of United States v. Von Key, Cr. 62 in this court, which, by agreement and from considerations of convenience and economy, have been received and are being considered herein) the defendant has challenged the legal validity of the constitution and erection and entire composition, both of Local Board No. 119 and of the Appeal Board, whose action upon the defendant's Selective Service status, *supra*, has been discussed herein. While defendant's counsel argue that point more directly in orientation to Local Board No. 119, the court understands it to be aimed with comparable, if not identical, application to the Appeal Board. This challenge is based upon the proved fact that upon Local Board No. 119, and the panel or panels thereof dealing with the defendant's status, all members were of the white race, and, actually, since its initial existence all members of Local Board No. 119 have been of the white race; whereas, the defendant is a negro and the population of the area within the jurisdiction of Local Board No. 119 includes a substantial and generally increasing number or percentage of members of the negro race, of which also about thirty percent of the Local Board's registrants are members. Digressing for the moment, it is also recalled that, at least through some twenty years, the membership of the Appeal Board here involved, despite some changes in personnel, has consistently been unanimously of the white race. The defendant's argument appears to insist that, with a view to the assurance to colored registrants of the area of Local Board No. 119, and, by analogy, of the jurisdictional area of the Appeal

Board, of an understanding and sympathetic approach to their problems, those negro registrants are entitled to have proportionate, or at least some, representation of their race upon the membership of the Local Board, and, as well, upon the membership of the Appeal Board.

By Title 50 App.U.S.C., section 460, it is provided, among other things, that:

"(b) The President is authorized:

(1) to prescribe the necessary rules and regulations to carry out the provisions of this title (Sections 451–454 and 455–471 of this Appendix)

\* \* \* \* \* \*

"(3) *to create and establish within the Selective Service System civilian local boards, civilian appeal boards,* and such other civilian agencies, including agencies of appeal as may be necessary to carry out its functions with respect to the registration, examination, classification, selection, assignment, delivery for induction, and maintenance of records of persons registered under this title (said sections), together with such other duties as may be assigned under this title (said sections). He shall create and establish one or more local boards in each county or political subdivision corresponding thereto of each State, Territory, and possession of the United States, and in the District of Columbia. *Each local board shall consist of three or more members to be appointed by the President from recommendations made by the respective governors or comparable executive officials.* \* \* \* *each member of any local board shall be a civilian who is a citizen of the United States residing in the county or political subdivision corresponding thereto in which such local board has jurisdiction.* \* \* \* *Such local boards, or separate panels thereof each consisting of three or more members, shall, under rules and regulations prescribed by the President, have power within the respective jurisdictions of such local boards to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption from training and service under this title (said sections) of all individuals within the jurisdiction of such local boards. The decisions of such local board shall be final, except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe. There shall be not less than one appeal board located within the area of each Federal judicial district in the United States and within each territory and possession of the United States, and such additional separate panels thereof, as may be prescribed by the President. Appeal Boards within the Selective Service System shall be composed of civilians who are citizens of the United States and who are not members of the armed forces. The decision of such appeal boards shall be final in cases before them on appeal unless modified or changed by the President. The President, upon appeal or upon his own motion, shall have power to determine all claims or questions with respect to inclusion for, or exemption or deferment from training and service under this title (said sections), and the determination of the President shall be final."* (Emphasis added)

In the way of implementation, it is further provided by Title 32 C.F.R., section 1604.52 that:

"(a) *A local board of three or more members shall be appointed for each local board area by the President upon the recommendation of the Governor.*

\* \* \* \* \* \*

(c) *The members of local boards shall be male citizens of the United States who shall be residents of a county in which their local board has jurisdiction and who shall also, if at all practicable, be residents of the area in which their local board has jurisdiction."* (emphasis added)

And, with regard to appeal boards, it is provided by Title 32 C.F.R., section 1604.22, that:

"For each appeal board area an appeal board, normally of five members, shall be appointed by the President, upon recommendation of the Governor. The members shall be male citizens of the United States who are not members of the armed forces or any reserve component thereof; they shall be residents of the area in which their board is appointed; and they shall be at least 30 years old. The appeal board should be a composite board, representative of the activities of its area, and as such should include one member from labor, one member from industry, one physician, one lawyer, and, where applicable, one member from agriculture. If the number of appeals sent to the board becomes too great for the board to handle without undue delay, additional panels of five members similarly constituted shall be appointed to the board by the President, upon recommendation of the Governor. Each such panel shall have full authority to act on all cases assigned to it. Each panel shall act separately. The State Director of Selective Service shall coordinate the work of all the panels to effect an equitable distribution of the work load."

■ From the related language quoted (*nuper* supra) from Title 50 App. U.S.C., section 460, and Title 32, C.F.R., section 1604.52, it is clear that neither any statutory, nor any regulatory, requirement exists, whereunder the appointment to membership either on a Local Board or on an Appeal Board in the Selective Service System must be made under any restriction or limitation rooted in the color or racial origin of an individual appointee, or whereunder the total membership upon either such board must be proportionalized according to the racial composition of the population of the area involved. Such a requirement would be a departure from American tradition, so wide as to evoke marked surprise. Granting the existence of localized regions within the country which in practice reject the nation's constitutional dedication to equality of right, its citizens, on a broad pattern, insist that justice be color blind, and live and act accordingly. But, whatever may be said of tradition, there is simply no requirement in the legal structure of the Selective Service System requiring selection of its administrative personnel upon any racially oriented pattern.

There is, moreover, no evidence that the defendant's classification, selection or order to report for induction was actually responsive to any consideration of race. On the contrary, his successive classifications and the changes therein, supra, were directed and timely related to reported and demonstrated changes in his educational program. His race did not operate to intercept the liberalization of his classification when his position in school warranted it. It ought not now to shield him from the withdrawal of that indulgence on the disclosure that it was no longer logically supportable. Finally, despite the detestability of persecution on whatever pretext, society should not, too readily or without mature consideration, grant its existence upon its every assertion, much less, on the prompting of suspicion.

Noted, too, in regard to Local Boards is the foregoing language of Title 32, C.F.R., section 1604.52. It contains a requirement (a) that members of any such board "be residents of a county in which their local board has jurisdiction, and (b) that, if at all practicable, they be residents of the area in which their local board has jurisdiction. Requirement "(a)" is mandatory, and it has here been complied with strictly. Requirement "(b)" manifestly allows the exercise by the appointing authority of judgment on the score of "practicability." It appears to have been exercised negatively. Certainly, there is no proof to the contrary.

In respect of the membership of the Appeal Board, so far as appears, the membership conforms to Title 32 C.F.R.,

section 1604.22. It, too, has no requirement of the conformity of membership on the Appeal Boards to any proportionalized racial pattern.

██ Finally, it is noted that the eligibility and qualification of members of the two boards here involved may not be challenged in a proceeding of this character. By way of summarization, it has been said that "the title of a person acting with color of authority, even if he be not a good officer in point of law, can not be collaterally attacked." Ex parte Ward, 173 U.S. 452, 19 S.Ct. 459, 43 L.Ed. 765; Johnson v. Manhattan Railway Company (2 Cir.) 61 F.2d 934; United States ex rel. Doss v. Lindsley (7 Cir.) 148 F.2d 22, 23, 158 A.L.R. 525; Jessen v. United States (10 Cir.) 242 F.2d 213.

 This court considers that the actions severally taken in relation to the status of the defendant by the Local Board, and by the Appeal Board, supra, may not by this court be nullified or disregarded on the ground of any racial or residential disability of either such board, or of any of its members. And it is persuaded that the evidence before the court is inadequate to warrant a finding that the defendant has been subjected to discriminatory, or otherwise unjust, treatment because of his race, by either of those boards.

██ The defendant asserts that "the failure to provide defendant with an advisor, as required by the applicable regulations, denied defendant a right indispensable to a fair hearing." And he cites, and quotes from, Chernekoff v. United States (9 Cir.) 219 F.2d 721, 724, in support of his thesis. His position is not well taken; and in his citation of the *Chernekoff* case, supra, he leans on a broken reed. It is true that in the case thus cited the Court of Appeals for the Ninth Circuit, speaking on February 24, 1955, asserted that if it were true that in Los Angeles County, a "practice persisted" of "[t]he failure

of the local board to comply with the posting of names and (sic) advisors as provided by 32 Code Fed.Regs., § 1604.41, supra," a problem of due process was presented, and, on that premise, declared that "we have serious doubt as to the validity of such a practice by the local boards." Its reference to 32 C.F.R., section 1604.41, was fortified by an ostensible copy of the cited section of C.F.R. in a footnote to the opinion. But the footnote, although quite obviously reflecting the language of the section of the Regulation as of the date of the accused conduct of Chernekoff under scrutiny in that opinion, was already "out of date." Effective as to facts arising on and after January 1, 1955, thus one month and twenty-four days[4] before the filing of the Chernekoff opinion, 32 C.F.R., section 1604.41 had been amended to read as follows:

"ADVISORS TO REGISTRANTS— APPOINTMENT AND DUTIES.

Advisors to registrants *may* be appointed by the Director of Selective Service upon recommendation of the State Director of Selective Service to advise and assist registrants in the preparation of questionnaires and other selective service forms and to advise registrants on other matters relating to their liabilities under the selective service law. Every person so appointed should be at least 30 years of age. The names and addresses of advisors to registrants within the local board area shall be conspicuously posted in the local board office."

Investigation reveals that the amended —and presently effective—form of the regulation under study differs from the same numbered regulation in its earlier form, and as quoted in the footnote above mentioned to the *Chernekoff* opinion, only in this particular, that as the fourth word of the body of the regulation, it substituted the word "may," for the earlier word "shall." Thus, it made permissive the appointment of advisors,

4. For discussion of the effective date of the amendment, as well as of some confusion therein, see Uffelman v. United States, (9 Cir.) 230 F.2d 297, 301.

which had, immediately theretofore and at the effective date of the alleged offense in the *Chernekoff* case, been mandatory. And by inevitable construction, it completely nullified its own final sentence in regard to those Local Boards which elected not to appoint advisors to registrants. For, if and where no advisors are appointed, there are no advisors "so appointed" within the Local Board area whose names must be "posted in the local board office."

This court offers no criticism of the *Chernekoff* opinion. It is simply disregarded as inapplicable to the current permissive regulation. See also Uffelman v. United States (9 Cir.) 230 F.2d 297; Clark v. United States (9 Cir.) 236 F.2d 13; Frank v. United States (9 Cir.) 236 F.2d 39; Yaich v. United States (9 Cir.) 283 F.2d 613, with their emphasis on the necessity of the establishment that failure to comply with Selective Service Regulations, even if actual failure be shown, be disregarded unless it be also shown that such failure actually resulted in prejudice to the registrant. Such prejudice in fact is not shown in the record presently before the court.

Besides, in the matter of the provision of advice to registrants, before the Local Board, it is credibly shown by testimony that the Board's coordinator and assistant coordinator customarily answer the questions of registrants, and that registrants may and do obtain advice from the government appeal agent, whose name and address are shown on the Board's bulletin board.

■ The defendant contends, and by evidence sought to prove, that the several boards, Local Board No. 119 and the Appeal Board, failed to devote adequate time to the consideration of problems of classification and selection, the defendant advancing that position especially in reference to his personal appearance before the Local Board on March 1, 1966, and also concerning the time devoted by the Appeal Board to his case on appeal. At the outset, it is found that on his appearances before the Boards, the defendant was allowed to say whatever he had to offer in his own behalf. The Local Board's record reflects certain disclosures of that character by the defendant. It is true that in the sessions of the several boards each of them generally handles a substantial number of registrants, many of them to the point of decision. But this is also true; the Boards have experienced and competent clerical assistants, who contribute to the processing of the work of the Boards by the study of files, by interviews with registrants, and others in their behalf, and by the preparation for, and presentation to, the Boards of memoranda both in aid of recollection, and as newly garnered information. The processing of the files before the Boards requires study, concentration, close reflection, and application to the task at hand. But the volume is not insuperable, nor its dispatch, within the available intervals of time, incredible.

■ It is also to be presumed that the several boards acted regularly and in accordance with regulations in the performance of their respective tasks. Storey v. United States (9 Cir.) 370 F.2d 255; Keene v. United States (10 Cir.) 266 F.2d 378. This presumption is not persuasively, or at all, rebutted in this proceeding.

Besides, upon the trial of this action, explicit and credible and credited testimony was given of the care which the members of the Local Board actually and regularly gave to the files before them, especially to those presenting claims to dependency or hardship, as those terms are understood in the selective service process.

■ Upon the subject adverted to in the last preceding paragraph, the defendant, through his competent counsel, argues earnestly that the defendant, before his Local Board, presented a claim to deferment which should be regarded as based upon dependency, or upon hardship, or upon both such situations in combination. In the first place, there is explicit evidence in his Selective Service

file before the Local Board, that such claim as he tendered in reference to his own, or his family's, economic situation was considered by that board. But reasonably—even liberally—regarded, it may not be concluded that he ever tendered to the board a supported claim either of dependency or of hardship, in a rational understanding of those terms. He did not advance either such claim in his initial classification questionnaire. Neither did he complete or return to the Local Board S.S.S. Form 118, the dependency questionnaire personally handed to him during his personal appearance before the Local Board on March 1, 1966. It is true that he stated at that time to the panel of his Local Board that he "had dropped out" of school "to work to help out at home as both father and mother had major surgery." But what major surgery, or the extent or duration of working disability consequent upon it, is not reflected. Nor is the family's economic position, or his own, instructively shown, beyond the statement that "Father makes about $80.00 per week as a sand tester at Pomona. Registrant stated he makes about $10.00 per house, works with uncle contracting work such as putting in windows, doors, etc., also sings in night club, has made one record, going to make another." The Local Board's persistence in his I–A classification in view of such a showing, thus obliquely, if at all, supportive of a really untendered request for deferment on the ground of either dependency or hardship, or both, was not either unsupported or unreasonable. And on appeal, it was affirmed by the Appeal Board, supra.

 To the defendant's contention that the practice of Local Boards not to allow registrants to be represented in the classification and selection process by legal counsel involves a denial of due process of law, two negative answers are at once obvious. First, the defendant does not show that he sought or was actually denied such representation. Secondly, the admittedly prevailing practice thus assailed is not a denial of due process

of law, or of any other right, and does not nullify or impair a registrant's classification. United States v. Pitt (3 Cir.) 144 F.2d 169; United States v. Sturgis (3 Cir.) 342 F.2d 328, 332, cert. den. 382 U. S. 879, 86 S.Ct. 164, 15 L.Ed.2d 120; United States v. Kovalchick (D.C.Pa.) 255 F.Supp. 826.

 This court does not consider that the absence of any showing that the several Boards formally advised the defendant of the reason or reasons underlying any board action adverse to him in the course of his classification and selection resulted in the denial to him of due process of law. It is demonstrated beyond question that he was explicitly and timely advised of any and all board actions touching his status, whether favorable or adverse to his position. That is what matters. And no more is by law required.

 Defendant objects to the course of each of the Local Board and of the Appeal Board in basing its action respecting the classification and selection of registrants on a "case to case" basis, determining each registrant's status upon the ground of its own underlying facts, rather than by rigid measurement according to an established formula. That contention is not well taken. Selective Service classification deals so intimately with a registrant's personality, circumstances and problems that the case to case method of arriving at conclusions is virtually the only practical and just one. Nor is it made here to appear how, if at all, the defendant was injured by the employment of that method, in his classification or in his selection.

Argument is advanced by the defendant which is patently based upon the supposition that the Local Board's final order and notice to him to report for induction, with which he failed to comply, was inspired through the denial by this court of his Petition for a Writ of Habeas Corpus. The supposition is simply unfounded. That he had earlier been ordered and notified to report for induction, supra, is clearly demonstrated. In the face of, and during, the pendency of

the Habeas Corpus proceeding, the Local Board respectfully refrained from pressing for compliance that earlier order and notice. But when the Habeas Corpus proceeding, in due time, failed to achieve the defendant's objective in its institution, the occasion for restraint came to an end; and the issuance of the final, and really supplemental, order and notice to report for induction became the obvious course to pursue. It was so pursued.

■ The denial to him of due process of law is also asserted by the defendant because, as he puts it, the government of the United States proposes to require him to enter into its military service, without providing him an appropriate equivalent in terms of economic and social security. That position is not well taken. Beyond question, military service presents one who performs it with hazards, physical, economic, moral and otherwise. But that is simply a solemn and sobering exposure to which any citizen in position, comparable or approximable to that of the defendant is, and historically has been, subject. The burden is, indeed, very personal to him. But it is in no wise unique. His fellow citizens of similar ages, state of health, family status and the like, irrespective of race or, saving indulgence in favor of conscientious objectors, of creed, are confronted by the same problem, with appropriate individual variations.

As has already been foreshadowed, the court does not in this ruling identify or discuss, item by item, the several rulings by it made during the trial upon the admission or rejection of evidence or testimony. They are preserved in the record of the trial. And the court stands generally upon its several rulings by the record reflected. Certain of such items probably require or deserve very brief mention. At several points in the trial, items of evidence were introduced in evidence, to whose reception objections were tendered, generally on the ground of competency or relevancy, or materiality. On several of those occasions the court, in the persuasion that with a view to factual adequacy the tendered material should be brought into the record, admitted it with reservation of the questions in which the objections were rooted. It may be understood that upon the factual reality of the objected items, the court has considered them to the extent that they were admitted. The ruling now foreshadowed and announced in advance will, it is thought, adequately disclose to what extent, if at all, it was affected or influenced by any evidence so admitted with reservation. The court might proceed, item by item, through all such material and signify and discuss the extent of its ministry to the ruling. But that appears to be neither necessary nor justified.

■ It is recalled also that on sundry occasions in anticipation of, and during the trial, the court was moved to take judicial notice of certain material, but denied and overruled the motions. Notable among those offered items is Exhibit "D", a report of the National Advisory Commission on Selective Service, of which several excerpts, as well as the entire report, were so presented for judicial notice, and, as well, introduced in evidence. Upon objection by the plaintiff, which was sustained, the court declined to take judicial notice of the tendered material, and rejected it as evidence. The court now announces that it persists in, and still adheres to that ruling. Briefly restated, the material is appropriate for consideration, if at all, or in any part, or in its entirety, by the legislative or the executive department of the government, or by both of those departments, but it is not receivable by this court in the context of the instant case.[5] It may

---

5. To the extent that the tendered material, including, but not limited to, that disclosed in the offered Exhibit "D", assails either the underlying reasoning, or the practical operation, of the Selective Service System, such material is of a highly political character, apt, indeed, for consideration by the Congress, or by the executive agencies of the United States, inclusive of the President and those who counsel him. That is particularly true of those parts of the tendered

also be understood that the court adheres to its rulings during the trial upon offers or motions renewing the offer of certain theretofore rejected evidence, and also renewing theretofore declined requests for the taking of judicial notice.

To come, finally, to its ruling upon the merits of the present case, the court first recalls the now settled bases upon which its action in a case of this character must rest.

▮ The court must not disregard, or interfere with, the defendant's classification under the Selective Service process unless it finds from the evidence and record before it, either that there is no basis in fact for that classification, or that the Local Board acted so arbitrarily or capriciously that the defendant was denied the constitutionally guaranteed due process of law. Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 90 L.Ed. 567; Cox v. United States, 332 U.S. 442, 448, 68 S.Ct. 115, 92 L.Ed. 59; Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132; Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428; Rogers v. United States (9 Cir.) 263 F.2d 283; and Badger v. United States (9 Cir.) 322 F.2d 902.

▮ A court may not review the correctness of, or nullify, the action of a Local Board if there be any evidence or basis in fact to support it. Ayers v. United States (9 Cir.) 240 F.2d 802, cert. den. 352 U.S. 1016, 77 S.Ct. 563, 1 L.Ed. 2d 548.

▮ In any judicial review of a defendant's classification, the court is limited to the evidence which was before the Local Board, and on which it acted. Cox v. United States, 332 U.S. 442, 454, 68 S. Ct. 115, 92 L.Ed. 59. Once the validity of a registrant's classification and selection, and order or notice to report for induction, is resolved favorably to the government, the issue remaining is whether the registrant knowingly failed or refused to report for, or submit to, induction. Reed v. United States (9 Cir.) 205 F.2d 216.

Let it be understood that the court denies and overrules a motion of the plaintiff contained in the initial paragraph, of its reply brief herein, for the striking of the defendant's brief.

Touching the finality of the decisions of the Boards within the Selective Service System, the Supreme Court has said in Estep v. United States, 327 U.S. 114, 122, 123, 66 S.Ct. 423, 427, 90 L.Ed. 567, that:

"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classifications made by the local boards are justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact

---

Exhibit "D" which are rooted in dissatisfaction with the current policy of the United States in connection with its political and military operations in Eastern Asia, notably in the Vietnam area. Involved therein is a problem of the policy of the United States of America in delicate international affairs. It is to be solved by the informed action or restraint of the executive and legislative branches of the Government. It is generally— and, with assurance, primarily—beyond the jurisdiction or the competence of the judiciary.

And this may be added. The classification and selection of the defendant as a registrant of Local Board No. 119 are for service in the "Armed Forces of the United States," not for certain service in any identified conflict, not yet, at least, even in a particular branch of such Armed Forces. The pendency of an Eastern Asian conflict may, indeed, be a persuasive motive for the enlargement of the nation's military establishment, and a selectee may eventually be assigned to service in that region. But it is inaccurate to declare that the defendant has been selected and ordered to report for military service in Vietnam.

for the classification which it gave the registrant."

■ From the findings and conclusions of the court already set out herein at length, it is made clear that the court finds that the plaintiff has proved each and every allegation of the indictment against the defendant, (*vide* supra) upon which this case has been tried, and as well, each and every element of the offense within which the indictment was found and returned, as those elements are set out in Title 50 App.U.S.C., section 462. It necessarily follows that the defendant is guilty of the offense charged against him in the indictment. And the court now so finds.

The court, therefore, announces that at the time and place of the resumption of proceedings in this action, infra, and upon the pleadings and evidence and testimony herein, and, pursuant to the findings and conclusions of this Memorandum Opinion, the court will make and enter judgment in this cause, adjudging the defendant to be guilty as charged in the indictment herein, supra, and pronouncing and entering sentence herein upon the defendant, after proceedings appropriate with respect thereto.

It will thus be obvious that, while the court construes and administers the approval of the stipulation, of which a copy is set out in footnote 1 hereto, as adequate to warrant the foregoing announcement herein of its findings and conclusions, and the foreshadowing of its adjudication of guilt, it does not now proceed under the stipulation either to the entry of judgment or to the pronouncement of sentence in this action. That measure of restraint appears to be in order as an accommodation to the prevailing climate of judicial opinion in controlling quarters touching the administration of criminal justice.

An order is, therefore, being made and given, and will be filed, concurrently herewith, continuing this cause until Monday, August 21, 1967 at 10:00 o'clock A.M., for the entry of judgment herein, and for the imposition of sentence here-

in, and for the entry herein of such other and further orders as shall then be necessary or proper, and requesting that, meanwhile, a presentence report herein be prepared and submitted.

MEMORANDUM FOR REFERENCE, INCIDENT TO ENTRY OF JUDGMENT AND IMPOSITION OF SENTENCE

After the preparation, transmittal and filing herein of the court's memorandum announcing its findings of fact and conclusions of law, and foreshadowing its final ruling, the trial judge, at his official station, received his copy of the August, 1967 issue of the AMERICAN BAR ASSOCIATION JOURNAL. Upon inspection, it was found to contain an article entitled:

CONSCRIPTION AND THE CONSTITUTION: THE AMAZING (sic) CASE OF KNEEDLER V. LANE (pp. 708 to 712 inclusive) by J. L. Bernstein, Esq. of the New Jersey Bar.

Upon its perusal, it has been observed that such article, oriented to Kneedler v. Lane, 45 Pa.St. 238, is apparently, though rather obliquely, considered by its author, to cast, or to be operative to cast, doubt upon the constitutionality of the statute under which the defendant is here prosecuted.

It must be understood that, throughout its reception and consideration of this case, this court has kept in view the essentiality to the maintenance of the instant prosecution of the constitutionality of the statute pursuant to which the indictment was found and returned. If such constitutionality be not validly present, the indictment must fail and the prosecution must be dismissed. And the court has observed, throughout its participation in the litigation that the defendant has tendered, in various ways made obvious in the record, positions and items of asserted evidence, designed, according to his views, to invalidate the constitutionality of the underlying statute, or to nullify its application, in the current circumstances, to the defendant. That course of the defendant has prompted

many rulings by the trial judge adverse to the defendant, during, and incident to, the trial, and also certain observations made in the memorandum prepared and filed, and already announcing herein the court's findings of fact and conclusions of law, and the substance of its final ruling. The record thus arising has been made. It is not now being reexamined or reconsidered in any sense.

But the timing and tenor of Mr. Bernstein's article have prompted this court to a review of the phase of this nation's history to which the author alludes, and of the reported opinions which appear to prompt him to perplexity respecting the instant tolerability of military conscription by the United States of America.

This court, upon that review, is convinced that Kneedler v. Lane, 45 Pa.St. 238, is quite inadequate to prompt—even more inadequate to support—a conclusion, or even a rational suspicion, that the currently operative Universal Military Training and Service Act is unconstitutional. Additionally, its essential validity has been judicially affirmed with an historical consistency which forbids a present denial of it by this court.

As reported, Kneedler v. Lane, supra, is not strictly "an opinion." It consists, as the presently acting judge of this court computes, of nine distinct, even if closely related, opinions, and extends through one hundred one pages of the Pennsylvania State Reports. The judicial deliverance was made, or deliverances were made, in it by the Supreme Court of the Commonwealth of Pennsylvania, or by successive and varying majorities of the Justices thereof, during the closing weeks of the year 1863, and the early weeks of the year 1864, thus, beyond the median point in the Civil War. Three distinct, but essentially comparable, suits were involved in it. In each such case a separate complainant, individually, filed a bill in equity in the Supreme Court of Pennsylvania against named respondents who were "officers of the enrolling Board of the Fourth Congressional District of Pennsylvania," under the Act of Congress entitled "An Act for enrolling and calling out the national Forces, and for other Purposes," approved March 3, 1863, that is, the so-called Civil War Military Draft Act of the United States of America. Each such bill in equity averred the enrollment and draft under the Act, of its complainant, the service on him of notice of such enrollment and draft and order to report at a named rendezvous on a designated day, etc., and the imminence of his being mustered into the military service, if such muster were not enjoined, and specified sundry alleged constitutional infirmities in the Act, and especially that it was "in derogation of the reserved rights of the states, and of the rights and liberties of the citizens thereof," and an unwarranted attempt enacted in the absence of the delegation "by the states or the people thereof" to the federal government of power for its enactment, and an invalid attempt to exercise the power to call forth the militia. And each such bill prayed "for an injunction to restrain the respondents from further proceeding with or under the said enrollment, requisition and draft of citizens of this commonwealth, and of persons of foreign birth who have declared their intentions to become citizens under and in pursuance of law, to perform compulsory military duty in the service of the United States, and from all other proceedings which violate the rights and invade the personal liberty of such persons, under pretence of executing the said law of the United States and particularly from all proceedings under this pretence against the person of the claimant."

On the filing of each of those bills in equity, a motion for a "special injunction" was made by the plaintiff in each case at Nisi Prius before one of the justices of the Commonwealth's Supreme Court, who requested his brethren to sit with him at the hearing. There were then a Chief Justice and four Associate Justices of the Supreme Court of the Commonwealth of Pennsylvania, all of whom sat in such hearing. The time fixed for the hearing was September 23, 1863, and notice thereof was given to the

appropriate United States District Attorney. But the United States District Attorney did not appear; and the Chief Justice directed that the hearing proceed without his appearance or participation, but with the appearance and participation of counsel, only for the several complainants. It did so proceed. Thus, the submission then made was only upon the demand for a "special" or "preliminary" injunction, not upon the final merits of the proceeding. The official report so indicates, for the action taken upon such submission is reflected in and by the following entry:

"ORDER—November 9, 1863. Preliminary Injunction (in each case) granted for the protection of the plaintiff on his giving bond with surety, to be approved by the prothonotary, in the sum of $500, according to law, and refused for any further purpose."

It is here observed that no bond was thereafter, or ever tendered or approved in any of the suits and that the injunctive order, supra, never actually became operative in any such case (infra).

But the foregoing order, as announced, had the concurrence of a bare majority of the court, namely, of the Chief Justice and two of his Associates, whereas the other two of his Associates dissented. And there is no opinion of the court, as such, supportive of that order. Each member of the court wrote and filed, as of November 9, 1863, a separate opinion. The Chief Justice, in his opinion, announced the entry of the order, and two of his Associates, though speaking separately, concurred in that entry. The other two Associate Justices separately dissented and explained their respective dissents.

Broadly, the Chief Justice and his concurring Associates argued in their separate opinions, but without exact identity of rational approach, that the Draft Act then in litigation was devoid of constitutional warrant, and was an invalid invasion of the rights of the several states and of the nation's citizens, and that the courts of the Commonwealth had the power to intercept by injunction the administration of the Act by the United States of America.

On the other hand, the two dissenting Associate Justices severally contended that the statute involved was a valid exercise of power constitutionally conferred on the United States of America by the people of the United States in the great charter of their government. Of those dissenters, one also explicitly denied the jurisdiction of the Commonwealth's court to enter an order of the character sought, whereby the national government would be enjoined from the execution of the Act; the other refrained from a determination of that question of state court jurisdiction, upon the premise that, on the merits, each plaintiff was without the right to any of the relief sought by him.

Beyond the entry of the Order of November 9, 1863, already reflected verbatim herein, the official report of the cases (see 45 Pa.St. 294, 295) provides the following information:

"No security was entered, and no writs of injunction issued in either of the three cases. On the 12th day of December, 1863, after the term of LOWRIE, C. J., had expired, and AGNEW, J., had taken his seat as one of the judges of the Supreme Court, Mr. Knox appeared for the defendants in each case, and applied to Judge STRONG, then holding the court at Nisi Prius to dissolve the injunctions, which had been granted as above stated." (Probably meaning the minute entry above identified, rather than any formal orders of injunction, of which none appear to have been prepared or filed, supra) "Judge STRONG received the motions and appointed the 30th December" (i. e. 1863) "for their hearing, and, as in the former proceeding, requested his brethren to sit with him. The motions to dissolve were argued before all the judges on that and succeeding day by Mr. Knox for the defendants and Messrs. George W. Biddle, Peter McCall and Charles Ingersoll,

for the complainants. On the 16th January, 1864, Judge STRONG representing the majority of the court, made the following order: 'And now, to wit, January 16, 1864, it is ordered by the court that the orders heretofore made in all these cases be vacated; and the motions for injunctions are overruled.' Separate opinions in favor of dissolving the injunctions were read by Judges STRONG, READ and AGNEW, and the joint dissenting opinion of Chief Justice WOODWARD and Judge THOMPSON was read by the Chief Justice."

It is here set out that the term, as a Justice of the court of the earlier Chief Justice Lowrie, expired on the first Monday in December, 1863, and that the chief justiceship then devolved upon Judge Woodward, the remaining Associate Justice then senior in tenure. It would appear to be reasonably inferable that the tenure of Judge Agnew, who had been elected to succeed Chief Justice Lowrie as a Justice, commenced on the first Monday in December 1863, with the lapse of the term of Chief Justice Lowrie. It may be understood, also, that the majority of the court acting in the ruling of November 9, 1863, consisted of Chief Justice Lowrie and Associate Justices Woodward and Thompson; the dissenting minority being Associate Justices Strong and Read. Noted also is the fact that, as of January 16, 1864 the prevailing majority of the court in the cited litigation consisted of Associate Justices Strong and Read and the newly elected Associate Justice Agnew; and the dissenting minority consisted of the then Chief Justice Woodward and Associate Justice Thompson.

In their several separate opinions as of January 16, 1864, Associate Justices Strong, Read and Agnew severally declared the United States Conscription Act of March 3, 1863 to be a valid and constitutional enactment, in the exercise of power to the Congress granted under the Constitution of the United States, and thus entitled to administration; and

challenged the jurisdiction of their court injunctively to intercept its execution and enforcement. In their joint dissenting opinion the then Chief Justice Woodward and Associate Justice Thompson adhered to their view, thereinbefore individually signified, that that Conscription Act was an unconstitutional measure adopted by the Congress without the constitutional bestowal upon it of the authority or power to enact such legislation, and, both expressly and by necessary implication, contended that their court had the power and the duty to thwart the attempt to administer or enforce, in the Commonwealth of Pennsylvania, the military draft within the contemplation of the Act.

It is not without at least minor significance that some, indeed probably all, of the opinions thus adverted to, both of those prompted by the motion for preliminary injunction, and of those ensuing upon the motion for the dissolution of the preliminary injunction originally granted, possess notably political overtones. To one reasonably familiar with the history of the United States, that occasions no surprise; for the acting jurists wrote in an atmosphere of high emotion and of bitter controversy. It is not, therefore, inexplicable that one of the Justices who, in his earlier opinion, had deplored the insidious intrusion of politics into the litigation, in his own later deliverance, betrayed the influence of that instrumentality upon his own thinking and expression.

But, ultimately, a study of Kneedler v. Lane, supra, discloses simply that, in the course of the consideration of, and ruling upon, a demand for a preliminary injunction in each of three distinct but similar Chancery proceedings, the Supreme Court of the Commonwealth, by a majority of three to two of its then Justices, first, upon the submission of the motion for preliminary injunction, and after a hearing wherein only counsel for the moving plaintiff appeared and participated, granted in part the requested preliminary injunction, thus leaving the main proceeding still pending and

undetermined; but that, after the lapse of the judicial tenure of one of that majority of the Justices and his replacement by a newly elected successor, and upon the tender after the election, by the defendants of a motion in each case to dissolve the preliminary injunction, and following argument upon such motions both for the plaintiff and for the defendants, and after due judicial consideration, and only sixty-eight days subsequent to the entry of the order for preliminary injunction (which preliminary injunction had never become operative by the provision of the bond on whose submission it was conditioned), the Supreme Court, as then constituted, by a majority of three to two of its then Justices, granted the motion to dissolve the preliminary injunction and dissolved it. Such study also discloses that the change in the court's attitude towards the preliminary injunction was directly responsive to the circumstance that, of the reconstituted court, three members considered, and acted upon the premise, that the Civil War Draft Act was constitutional and valid, whereas, three members of the court as constituted on November 9, 1863, had, as of that date, considered, and acted upon the premise, that such Act was unconstitutional and void. There is no scandal in such an incident. The personnel of an elected court must change, whether by the resignation or death or disability of Judges, or simply by the expiration of prescribed judicial terms, and the ensuing necessary replacements. Nevertheless, the court survives and persists, and it acts through its personnel as it is validly constituted from day to day. And its rulings are those of the court.

It results, therefore, that the ultimate ruling of the Supreme Court of the Commonwealth of Pennsylvania in Kneedler v. Lane, supra, was to the effect that the United States Conscription Law of March 3, 1863 was a valid and constitutional legislative enactment, in the exercise of power, to the Congress granted under the Constitution of the United States. And that legal conclusion is not nullified or impaired by the obviously demonstrated fact that, only recently theretofore, the same court with slightly different membership had considered that Act to be unconstitutional and void. Nor would it have mattered if the alteration in the majority view had arisen, not after any modification in the personnel of the court, but rather with unchanged membership; but after a change of his legal view by one the Justices. Occurrences of that character are far from unknown, and may easily be demonstrated. For it is true that wise men occasionally "change their minds."

It may be added that this court's acceptance as constitutional, of the current Universal Military Training and Service Act, as amended, rests only lightly, if at all, upon Kneedler v. Lane, supra. But if that case were presently being accorded even more persuasiveness than is here bestowed upon it, such allowance would evoke no apology from this court. For in 1917, the Supreme Court of the United States, in an unanimous opinion by Mr. Chief Justice White in Selective Draft Law Cases, 245 U.S. 366, 388, 38 S.Ct. 159, 62 L.Ed. 349 (*vide infra*) by way of added support of its then announced ruling declaratory of the constitutionality of the "First World War" Selective Draft Act, used this language:

> "Cogency, however, if possible is added to the demonstration by pointing out that in the only case to which we have been referred where the constitutionality of the Act of 1863 was contemporaneously challenged on grounds akin to, if not absolutely identical with, those here urged, the validity of the act was maintained for reasons not different from those which control our judgment. Kneedler v. Lane, 45 Pa. 238."

In fine, although with acknowledged repetition, it is now expressly signified that the recent journalistic exhumation of Kneedler v. Lane, 45 Pa.St. 238, supra, does not move this court to a recession from its persuasion that the presently operative selective service system and the Universal Military Training and

Service Act are constitutional and enforceable and administrable. For in the century and more since January 16, 1864, any possible question upon that issue appears conclusively and irreversibly to have undergone judicial determination supportive of the validity and constitutionality of the statute now involved. Fortunately, the vindication of that statement may be offered with becoming brevity. The unanimity wherewith the constitutionality of the so-called "draft acts" has been affirmed facilitates such expedition.

The broad constitutionality of a legislative enactment clothing the United States of America with the power to raise a national military force was probably litigated most directly and most comprehensively as an incident to the so-called first world war. The urgencies of our eventual involvement early in 1917, in an already advanced international war of unprecedented magnitude and territorial reach, touching which the deepest emotions of millions of our citizens had been aroused, made its tender inevitable. Such litigation arrived at the point of decision early in 1918. Some six suits, all challenging the constitutionality of the Selective Draft Law of May 18, 1917, 40 Stat. at Large, 76, c. 15 (of which the senior in pendency seems to have been entitled, Arver v. United States, No. 663) were argued in the Supreme Court of the United States on December 13 and 14, 1917, and were decided in a single opinion on January 7, 1918 under the general caption of "Selective Draft Law Cases," 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349. Submitted with them, and decided on January 14, 1918 were Goldman v. United States, 245 U.S. 474, 38 S.Ct. 166, 62 L. Ed. 410; Kramer v. United States, 245 U.S. 478, 38 S.Ct. 168, 62 L.Ed. 413; and Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414, in each of which a separate opinion was written and reported, wherein, however, incorporation by reference was made of material which those three cases had severally in common with the six cases dealt with in the Selective Draft Law Cases, supra.

The opinions in all of those cases were written for the undivided court by Mr. Chief Justice Edward Douglass White. It is observed in passing that he brought to that effort a notably qualifying personal background. He was born in 1845 in Thibodeaux, Louisiana. At the outset of the Civil War barely sixteen years of age, he withdrew from school and enlisted as a private infantry soldier in the army of the Confederate States of America, and remained in that service until the cessation of hostilities. He thereupon, pursued the study of the law and was admitted to the bar of Louisiana in 1868. He served during four years as a State Senator in the legislature of Louisiana; then, under appointment, served as an Associate Justice of his state's Supreme Court, pending a reorganization of that court, after which he practiced law in Louisiana for some twelve years, at the end of which interval he commenced the service of a term in the United States Senate. That term, however, was brought to an unexpected termination by his appointment on February 19, 1894 as an Associate Justice of the Supreme Court of the United States, in which office he served for nearly seventeen years, at the end of which time, and effective December 19, 1910, he became Chief Justice of the United States, which position he occupied until his death in 1921. This capsulated recollection of his career would ordinarily be purposeless, possibly indeed inappropriate, in the announcement of a judicial determination. But it is thought probably to have relevance to the subject of his capacity to speak, *sicut habens auctoritatem*, respecting litigation involving the history of the United States—even, in some facets, of the Confederate States of America—the constitutional framework of this nation, the allocation of its governmental powers, and, especially well for a Supreme Court Justice in 1918, the realities of actual military service; all that and, besides, a mastery of American

Constitutional Law perfected and exhibited during his then already long service on the Supreme Court. It is not unthinkable that the career thus briefly recalled made a contribution to the opinion, whereof in the memorial services after its author's death, his distinguished successor, formerly United States Circuit Judge, Solicitor General of the United States, Secretary of War, and President of the United States, William Howard Taft, said: "The Chief Justice, in the Selective Draft Case, delivered one of his great opinions," 257 U.S. XXVII.

Particularly in the Selective Draft Law Cases, 245 U.S., beginnig on page 366 and extending through some twenty-five pages, 38 S.Ct. 159, but also by means of incorporation by reference in the other three cases, supra, the Supreme Court examined and rejected all of the grounds of asserted invalidity and unconstitutionality advanced against the First World War Draft Act, and affirmed its constitutionality and validity. Especially rejected, item by item, where the several grounds of claimed unconstitutionality, which, in their separate opinions, supra, were relied upon in Kneedler v. Lane, supra, by Chief Justice Lowrie and Associate Justices Woodward and Thompson, as supportive of the prevailing ruling of November 9, 1863, and by then Chief Justice Woodward and Associate Justice Thompson in their dissent from the eventual ruling of January 16, 1864. It is considered to be unnecessary, and actually purposeless, to proceed through the details of the judicially announced justification by the Supreme Court of the constitutional validity of military draft legislation by the Congress of the United States and under the national government's authority.

Somewhat later in the same year, in Cox v. Wood, 247 U.S. 3, 6, 38 S.Ct. 421, 62 L.Ed. 947, the Supreme Court's affirmance of the constitutional validity of the First World War Draft Act was reiterated in an unanimous opinion, also written by Mr. Chief Justice White. Incidentally, in that opinion, the court says, in recollection and partial explanation of the grounds of its rulings in the Selective Draft Law Cases, supra, that:

"Coming to consider the elaborate contentions and arguments supporting them made in the present case, it is indisputable that they all rest upon the assumption as to the exclusive character of the delegation made to Congress by the militia clause (article I, § 8) and the restriction, as to the use of the military force raised under such delegation, resulting from the provisions in the clause relied upon, that is, the prohibition of compulsory service beyond the territorial limits of the United States. But we are of opinion that we are not now called upon to consider these contentions as a matter of original inquiry, because the fundamental mistake upon which all the arguments rest and the error in the conclusion which they are advanced to sustain, were pointed out and conclusively established by the decision sustaining the Selective Draft Law recently announced in the Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349. *This result is apparent since on the face of the opinion delivered in those cases the constitutional power of Congress to compel the military service which the assailed law commanded was based on the following propositions: (a) That the power of Congress to compel military service and the duty of the citizen to render it when called for were derived from the authority given to Congress by the Constitution to declare war and to raise armies. (b) That those powers were not qualified or restricted by the provisions of the militia clause, and hence the authority to exercise the War power to raise armies and use them when raised was not subject to limitations as as to the use of the militia, if any, deduced from the militia clause. And (c) that from these principles it also follows that the power to call for military duty under the authority to declare war and raise armies and the duty*

*of the citizen to serve when called were coterminous with the constitutional grant from which the authority was derived and knew no limit deduced from a separate, and for the purpose of the War power, wholly incidental, if not irrelevant and subordinate, provision concerning the militia found in the Constitution."* (emphasis added)

It is noted, too, that the first paragraph of the syllabus in Cox v. Wood, supra, reads as follows:

*"Congress may conscript for military duty in a foreign country; the militia clause is not a limitation upon the war power.* Selective Draft Law Cases, 245 U.S. 366, [38 S.Ct. 159, 62 L.Ed. 349] *followed."* (emphasis added)

That language correctly summarizes the thrust of the body of the opinion itself.

The Supreme Court having thus emphatically answered the constitutional question, the citation of like rulings by other courts of the United States may well be, and almost certainly is, supererogatory. But a few very brief references to opinions selected from recent decisions directly pertinent to later, even currently effective, like legislation are thought to be appropriate. In that behalf, the court, at this point, refrains from needless cumulation of citations or quotations from the many available comparable decisions. Scant service is rendered by the judicial belaboring of the obvious.

The constitutionality of the Selective Service Act of 1948 (otherwise, and, since June 19, 1951, more exactly called the "Universal Military Training and Service Act," see 65 Statutes at Large, 75) was drawn into controversy in United States v. Henderson (7 Cir.) 180 F.2d 711, 713 (cert. den. 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372) arising out of three separate cases. The court there, in affirming convictions of sundry defendants for refusing to register under the Act, used the following presently instructive language:

"The defendants contend that the 1948 Selective Service Act is unconstitutional. They impliedly admit, as they must, that it is within the power of Congress to enact a selective service or draft law in time of war, Selective Draft Law Cases (Arver v. United States) 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361 Ann.Cas. 1918B, 856, but contend that Congress may not exercise such power in time of peace. Both reason and the decided cases are against this contention of the defendants.

"Congress was expressly given the power 'To raise and support Armies * * *' U.S.Const., Art. I, Sec. 8, Cl. 12. This is an unqualified power given to Congress in order that it may protect the very existence of government. There is neither express nor implied limitation in the Constitution to this power. If, as contended by defendants, Congress could only exercise this power to conscript and train men when the country is at war, such action might then be unavailing, because it would come too late. To successfully fight modern war an army must be equipped with modern implements of war and be thoroughly trained in their use. This can not be accomplished in a short time. One of the stated purposes of our Constitution was to 'provide for the common Defense.' It is fundamental that a nation must have the power to defend itself against enemies, both actual and threatened. Peacetime selective service acts have been held constitutional in United States v. Lambert, 3 Cir., 123 F.2d 395; United States v. Lamothe, 2 Cir., 152 F.2d 340; United States v. Rappeport, D.C., 36 F.Supp. 915 affirmed in United States v. Herling, 2 Cir., 120 F.2d 236."

To like effect is United States v. Bolton (2 Cir.) 192 F.2d 805, 806, wherein the Court of Appeals said:

"The sole ground upon which the appellant attacks his conviction is the asserted unconstitutionality of the Selective Service Act of 1948. He concedes that the Supreme Court has up-

held the validity of a prior statute requiring compulsory military service, Selective Draft Law Cases (Arver v. U. S.) 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, and that at least one Court of Appeals has held constitutional the 1948 Act. United States v. Henderson, 7 Cir., 180 F.2d 711, certiorari denied 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372. But he argues that the question should be reconsidered, and particularly because as applied in the present world situation men are drafted for war service in a foreign country, Korea, without any declaration of war by congress and 'without the consent of Congress.' If the constitutionality of a statute requiring compulsory military service is to be reconsidered, such reconsideration should be by the Supreme Court; we shall not presume to do so. So far as the argument of unconstitutionality invokes the possibility that the appellant may be sent to fight in Korea, we think that is premature. Any question as to the legality of an order sending men to Korea to fight in an 'undeclared war' should be raised by some one to whom such an order has been directed, not to the appellant, who might never be ordered abroad for military duty, even if he reported for induction. Cf. United States v. Richter, 9 Cir., 181 F.2d 591, 594, certiorari denied 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647."

Emphasizing the inadequacy of the absence of a formally declared war to nullify the effective constitutional validity of the current Universal Military Training and Service Act, see also United States v. Herling (2 Cir.) 120 F.2d 236; Stone v. Christensen (D.C.Or.) 36 F. Supp. 739; United States v. Rappeport (D.C.N.Y.) 36 F.Supp. 915 (one of the cases involved on appeal in United States v. Herling, supra); Bertelsen v. Cooney (5 Cir.) 213 F.2d 275, 277, cert. den. 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 674, Reh. den. 348 U.S. 890, 75 S.Ct. 205, 99 L. Ed. 699; United States v. Lambert (3 Cir.) 123 F.2d 395; United States v.

Garst (E.D.Pa.) 39 F.Supp. 367, 368. In the opinion last cited, the judge aptly directed attention to language of Alexander Hamilton in an article in Vol. XXIV, The Federalist, wherein that architect of American policy forcefully exposed the inevitable folly of a nation's imperative awaiting of a formal declaration of war against, or by it, before it may erect a defensive force. Thus, as he concludes, "We must receive the blow before we could even prepare to return it."

Finally, the Court of Appeals, Ninth Circuit, has consistently sustained the constitutionality of the Universal Military Training and Service Act; and it has also recognized and declared that its operation and enforcement may not be intercepted in consequence of the absence of an existent state of war at the critical time either of its invocation or of its passage and approval. Cannon v. United States (9 Cir.) 181 F.2d 354, cert. den. 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647; Local Draft Board No. 1 of Silver Bow County, Montana v. Connors (9 Cir.) 124 F.2d 388; Richter v. United States (9 Cir.) 181 F.2d 591, cert. den. 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647. In the *Richter* case, the Court of Appeals sustained the constitutional validity of the operation of the selective service system in times of peace. Relevant to that issue, the court there said:

"In advance of his principal argument, appellant contends that Congress has no constitutional power to raise a peace time army by conscription. There is no merit to this claim. The government has the right to the military service of all of its able-bodied citizens, and may, when an emergency arises, justly exact that service from all. In re Grimley, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636. The power to raise and support armies is not limited to time of war. Congress has the power to compel military service of a citizen in peace time or war time, whenever it declares that it is necessary or that an emergency exists requiring the raising of an army." (Citing United States v. Her-

ling, supra; United States v. Garst, supra; and United States v. Lambert, supra) Emphasis added by the writer hereof.

The court is persuaded that the position thus reflected of the Court of Appeals, Ninth Circuit, need not be fortified by the citation of further authorities. It is firm, and well understood to be so.

■ In the light of the familiar judicial recognition, upon a nationwide pattern, of the constitutionality of the Universal Training and Service Act, and especially of the adherence to, and leadership in, that view by the Supreme Court of the United States, this court has proceeded, and now proceeds, in the present litigation, with the conviction that the Act, and the Selective Service System, are constitutional, and are validly enforceable and administrable. That conviction underlies the memorandum opinion announcing its findings of fact and conclusions of law, and foreshadowing its final judgment, which the court has already prepared and filed herein.

And, while, possibly out of respect for the stature of the journalistic medium wherein Mr. Bernstein's article, supra, appears, that article and its tentatively advanced position have had the court's renewed and careful study, the court persists in its opinion that the statute, within which the present indictment was found and returned, and the submission of this case has been made, is valid and constitutional. And that opinion has not been either dissipated or impaired by the revisitation of Kneedler v. Lane, supra, of which, naturally, the court has long been aware, if for no other reason, in consequence of its citation, at least as a "make weight" factor, in the Supreme Court's opinion in Selective Draft Law Cases, supra.

The court, therefore, enters no novel order herein, but simply adheres to the findings and conclusions, and reiterates the order and directions, of the earlier memorandum in this case.