**UNITED STATES v. HENDERSON.**

**UNITED STATES v. WILDMAN.**

**UNITED STATES v. SHUFFLEBARGER.**

**UNITED STATES v. FRANTZ.**

Nos. 9996–9999.

United States Court of Appeals
Seventh Circuit.

Feb. 27, 1950.

Writ of Certiorari Denied May 29, 1950.
See 70 S.Ct. 997, 998.

Harrop A. Freeman, Ithaca, N. Y., E. Earl Robbins, Centerville, Ind., for appellant.

B. Howard Caughran, United States Attorney, Indianapolis, Ind., Elba L. Branigin, Jr., Assistant United States Attorney, Maurice W. Graston, Assistant United States Attorney, Indianapolis, Ind., for appellee.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

Each of the above named defendants was charged, either by indictment or information, with having unlawfully, knowingly, and wilfully failed and refused to present himself for, and submit to registration before a duly authorized registration official or local selective service board, all as required of him by the Selective Service Act of 1948, 50 U.S.C.A.Appendix, §§ 451–470, a Proclamation of the President of the United States, issued and promulgated thereunder July 20, 1948, No. 2799, 50 U.S.C.A.Appendix, § 453 note, and Selective Service Regulations duly issued pursuant to said Act and then in full force and effect, all as the defendant then and there well knew. Three of the defendants were tried by a jury and one by the Court. All were found guilty as charged, sentenced to imprisonment for ninety days and fined $100.00. Since all four cases present the same questions, defendants' attorneys have stipulated with the United States Attorney that the four cases should

be consolidated for the purposes of this appeal.

In appellant's brief it was alleged that the trial court had not conducted the trial in such a manner as to result in a fair trial to the defendants. In the argument before this Court, however, counsel for the defendants stated that they were not urging this as a ground for reversal, and we shall, therefore, not further consider it.

The defendants contend that because of their religious beliefs, their rights under the First Amendment would be violated if they were required to comply with the Selective Service law by registering thereunder. Three of the defendants are members of the Society of Friends (Quaker) and affiliated organizations. They profess to believe, and their sincerity is not questioned, that war is never justified and that since registration is in aid of war it is likewise wrong. The fourth defendant professed the same belief, although not a member of any church.

Each of the defendants admitted that he was familiar with and understood the requirements of the Act as to registration, but insisted he would not register because of his religious beliefs. At the time for registration under the Act, each of the defendants, instead of appearing in person, wrote a letter to the local board explaining that he was opposed to war and conscription and did not intend to register; and each indicated that he was willing to accept the consequences of disobedience. Thereafter, they were interrogated by a special agent of the Federal Bureau of Investigation. In these interviews each stated that he could have registered, but that he did not register at any time or place under the Selective Service Act of 1948; and each again stated that he did not intend to register due to his religious beliefs.

The letters written by the defendants illustrate their attitudes.

Defendant Wildman, in his letter to his local board said, "I feel that conscription for military service is wrong and I must protest it by refusing to register. I do this only after a great deal of thought, for I realize that going against the law may have serious implications."

The defendant Shufflebarger said in a letter to his local board that he felt that he could not comply with the Selective Service Act of 1948 (requiring registration). Although he did submit to registration under the Selective Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq., he explained that, "I now feel that I cannot accept conscription even by the token of registration for selective service."

Defendant Henderson in a letter to the local board said, "I cannot register for military draft. Not only am I unwilling to take military training myself, but I am also unwilling for my country to have a law requiring military training for its youth. I must protest against that law. Of course, I believe in government. If I must disobey a law, I must be willing to accept the consequences of disobedience, as set forth in the law."

The defendant Frantz wrote a letter to his local draft board inclosing a copy of his letter to the President of the United States and saying, "I regret there is no place in the present Act in which I can give my cooperation." In his letter to the President, Frantz explained his membership in the Society of Friends; stated that he did not believe in war, nor preparation for war; stated that registration is a recognition of the government's right to conscript for war and is wrong, because war is wrong; and said that he could not be consistent with his belief and acknowledge the right of the government to conscript, "an admission I would be making if I should register."

Section 3 of the 1948 Selective Service Act, 50 U.S.C.A.Appendix, § 453, provides that: " * * * it shall be the duty of every male citizen of the United States * * * who, on the day or days fixed * * * is between the ages of eighteen and twenty-six, to present himself for and submit to registration * * *."

Section 12 of the Act, 50 U.S.C.A.Appendix, § 462, defines offenses under the Act and provides penalties therefor. It

provides that: "* * * any person who shall knowingly make * * * any false statement or certificate regarding or bearing upon a classification * * * or who otherwise evades or refuses registration * * * or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under (the Act) * * * shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment * * *."

 The defendants contend that the 1948 Selective Service Act is unconstitutional. They impliedly admit, as they must, that it is within the power of Congress to enact a selective service or draft law in time of war, Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856, but contend that Congress may not exercise such power in time of peace. Both reason and the decided cases are against this contention of the defendants.

Congress was expressly given the power, "To raise and support Armies * * *". U.S.Const., Art. I, Sec. 8, Cl. 12. This is an unqualified power given to Congress in order that it may protect the very existence of government. There is neither express nor implied limitation in the Constitution to this power. If, as contended by defendants, Congress could only exercise this power to conscript and train men when the country is at war, such action might then be unavailing, because it would come too late. To successfully fight modern war an army must be equipped with modern implements of war and be thoroughly trained in their use. This cannot be accomplished in a short time. One of the stated purposes of our Constitution was to "provide for the common Defense". It is fundamental that a nation must have the power to defend itself against enemies, both actual and threatened. Peace-time selective service acts have been held constitutional in United States v. Lambert, 3 Cir., 123 F.2d 395; United States v. Lamothe, 2 Cir., 152 F.2d 340; United

States v. Rappeport, D.C., 36 F.Supp. 915, affirmed in United States v. Herling, 2 Cir., 120 F.2d 236.

 The principal contention of the defendants is that the Act is unconstitutional as applied to them in that their religious belief, being contrary to war and even contrary to registering under a selective service act, which is, or may be, in aid of war, is protected by the First Amendment to the Constitution to the extent that they were not required by the Selective Service Act of 1948 to present themselves for, and submit to registration. Consequently, they contend that their right to exercise religious freedom cannot be abrogated by requiring their obedience to the Act. It is our opinion that the defendants have neither reason, nor authority, to sustain this contention.

The Constitution, Art. I, Sec. 8, after giving Congress various powers, including the power to raise armies, expressly gives Congress the power: "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers * * *." U.S.Const., Art. I, Sec. 8, Cl. 18. To raise an army Congress must necessarily have the power to take an inventory of and to classify the available manpower of the nation. This is all that registration under the Act actually amounted to, so far as these defendants were concerned. All of the defendants admitted that they were familiar with the provision of the Act by which the local boards were empowered to defer them on account of their religious beliefs. One of them was past the age at which he would have been required to serve under the Act. Their only excuse for noncompliance with the registration provisions of the Act was that they were compelled by their religious belief to refuse to comply. If the law were to be considered applicable only to those men who have no scruples against registering, the inventory of manpower so taken would be of little value. However, the defendants insist that "A person whose religion holds that all war and preparation for war, including registration for a selective service law, are evil, cannot be found guilty of a crime for carrying out

his religion by refusing to do any affirmative act toward registration." This conclusion was reached by the argument that the First Amendment guarantees to each person the free exercise of religion; that the free exercise of religion means that each individual must be free to do or not to do any act solely according to the promptings of his personal conscience; and that this guarantee of freedom is absolute, except in cases where the religion of the individual impels him to do an affirmative act which "is contrary to the basic Judeo-Christian ethic of our society," or is such an act as to result in harm to a specific person other than the state.

In support of this theory the defendants rely principally on three cases, Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L. Ed. 430; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S. Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; and Girouard v. United States, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084. In Thomas v. Collins, supra, the Supreme Court held that an official representative of a labor organization could not be held guilty of contempt of court for failing to obey a court order which enjoined him from making a speech or soliciting memberships in his union until he had registered for, and been issued, an organizer's card, pursuant to a Texas statute, Vernon's Ann. Civ.St. art. 5154a; that the statute and the court order constituted an unreasonable and illegal restraint on freedom of speech and assembly. The Supreme Court said, 323 U.S. at page 529, 65 S.Ct. at page 322: "The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins." After discussing the importance and sanctity of the individual freedoms, the Court continued, 323 U.S. at page 530, 65 S.Ct. at page 322: "For these reasons any attempt to restrict those liberties (liberties guaranteed by the First Amendment) must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger." In this statement the Supreme Court recognized that the freedoms guaranteed by the First Amendment must yield when the public interest is threatened by a clear and present danger.

In Girouard v. United States, supra, the Supreme Court held that an alien seeking naturalization, and willing to take an oath that he would support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic, was entitled to citizenship, even though he stated in his application that, because of his religious belief, he would not be willing to take up arms in defense of this country. The Court there was interpreting an Act of Congress and was not considering the question of religious freedom, as guaranteed by the First Amendment, excusing a citizen from military service or from the obligation of registering, pursuant to a selective service act. In the course of the opinion it was pointed out that religious scruples against bearing arms have been recognized by Congress in the various draft laws, and that Congress has recognized that [328 U.S. 61, 66 S.Ct. 828] "one may adequately discharge his obligations as a citizen by rendering noncombatant as well as combatant services. * * * even in time of war one may truly support and defend our institutions though he stops short of using weapons of war." We find in this opinion recognition of the fact that Congress may excuse a citizen, because of religious beliefs, from bearing arms, and be satisfied with non-combatant service. The Court did not say that the First Amendment to the Constitution would prevent a conscientious objector from being conscripted or from being required to render combatant service.

In West Virginia State Board of Education v. Barnette, supra, the Court held that members of Jehovah's Witnesses could not be required to comply with a regulation of the West Virginia State Board of Education, adopted under authority of a State statute, that required all teachers and pupils to salute the American flag as a regular part of the program of activities in the public schools. The regulation also provided that a refusal to comply should be regarded as an act of insubordination and dealt with accordingly. The Court after pointing out that failure to comply there

was harmless to others and to the State, continued, 319 U.S. at page 642, 63 S.Ct. at page 1187: "But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order. If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." The defendants lay great stress on this statement but in a footnote to this statement the Court added the following: "The Nation may raise armies and compel citizens to give military service. Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856. It follows, of course, that those subject to military discipline are under many duties and may not claim many freedoms that we hold inviolable as to those in civilian life." By this footnote the Court clearly indicated that the individual's right to religious freedom must yield to his duty to render military service to the Nation if his service is needed.

It is true that each of the draft laws, including the Selective Service Act of 1948, has taken notice of the fact that we have citizens with the religious belief that war, and participation in war, is wrong, and each of these draft laws has made provision that those having such religious beliefs might be assigned to non-combatant service. The 1948 Selective Service Act goes even further and excuses them from non-combatant service if the local board finds that even that service would be against their religious scruples.

It seems that this recognition by Congress of the religious beliefs of some of our citizens has been interpreted by them as an admission that the religious freedom guaranteed by the First Amendment excuses them from participation, of any kind, in war or the preparation for war. With this interpretation we cannot agree. If this Nation were successfully attacked and conquered by enemies from without, or within, none of us would have the rights guaranteed to us by the First Amendment. It is this Constitution which gave us these rights, and it is the Government set up by this Constitution which has jealously protected these rights for us since the birth of this Nation.

To guarantee the survival of this Government for the protection of these rights the Constitution gave Congress the right to raise armies. To raise armies they must necessarily call on the manpower of this Nation. The power to call on only those who were willing to fight could not have been the intention of the framers of the Constitution. A nation engaged in war is fighting for its existence. The framers of the Constitution intended that Congress should have the power, if necessary, to call on *every* citizen to come to its aid. In these days of total war, war means just what that name implies, a war of all, as a unit, for the preservation of our Nation, our ideals and our freedoms. As said by the Supreme Court in the Selective Draft Law Cases, supra, 38 S.Ct. at page 161: "* * * a governmental power which has no sanction to it and which therefore can only be exercised provided the citizen consents to its exertion is in no substantial sense a power."

It is equally evident that the need for raising an army must be a question to be left to the final decision of Congress. It would be hard to conceive of our being engaged in any war to which there would not be some objectors, conscientious or otherwise; where some of our citizens would think the war not justified, who would think the declaration of war and the waging of war unnecessary. If the question of the necessity of war or the preparation for war were to be left to the answer of the courts on the petition of individuals, instead of to Congress, the war might well be over and our guaranteed freedom something only to be remembered before Congress could act and raise an army. Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A. 1918C, 361, Ann.Cas.1918B, 856; United States v. Mroz, 7 Cir., 136 F.2d 221; Heflin v. Sanford, 5 Cir., 142 F.2d 798, 800;

Roodenko v. United States, 10 Cir., 147 F.2d 752, certiorari denied, 324 U.S. 860, 65 S.Ct. 867, 89 L.Ed. 1418; United States v. Lamothe, 2 Cir., 152 F.2d 340; Warren v. United States, 10 Cir., 177 F.2d 596; Gara v. United States, 6 Cir., 178 F.2d 38; see also United States v. Norton, 2 Cir., 179 F.2d 527.

■ The final argument of the defendants is that none of the defendants had the criminal intent, which was necessary to a conviction. This argument scarcely deserves our consideration. Each of these defendants was a mature, young man, educated and intelligent. Each understood the law and what it required of him. Each deliberately decided not to meet its requirements, knowing that penalties were provided for non-compliance, and that such penalties might be meted out to him. As this Court said in United States v. Mroz, supra, 136 F.2d at page 226: "Appellant's clear and unqualified duty was to comply with his draft board's order. He can not 'take the law into his own hands' and render himself invulnerable to consequences. The draft machinery has been legally set up, and it is not for the individual to constitute himself judge of his own case." Each defendant here intended to, and did, deliberately violate the Act. That is sufficient to support his conviction. The defendants are fortunate that the District Court did not impose more severe penalties.

The judgments of the District Court are affirmed.