**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald Smeltz BUTLER, Defendant-
Appellant.**

**No. 17579.**

United States Court of Appeals
Sixth Circuit.

Feb. 8, 1968.

Ralph Rudd, Cleveland, Ohio (Rudd, Ober & Miller, Cleveland, Ohio on the brief), for appellant.

Marvin M. Karpatkin, New York City (Bernard A. Berkman, Cleveland, Ohio on the brief), As Amicus Curiae for American Civil Liberties Union.

James L. Oakar, Cleveland, Ohio (Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, on the brief), for appellee.

Before O'SULLIVAN, PHILLIPS, and CELEBREZZE, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Appellant was sentenced to five years imprisonment for knowingly failing to report for induction into the armed forces, in violation of Title 50, U.S.C., App. §§ 456 and 462. No claim is made of any administrative unfairness or lack of procedural due process in the Selective

Service Board's rulings. Appellant admits he knowingly failed to report, and defends solely on the ground that at the time he was ordered to report for induction (February 4, 1964) the draft law was unconstitutional in that it would have deprived him of his liberty and perhaps of his life without due process of law, in violation of the Fifth Amendment to the Constitution of the United States. This is so, he says, because the Congressional purpose to provide for the common defense *could have been* accomplished by less drastic means than conscription if incentives for voluntary enlistment had been improved, chiefly by increased pay and opportunities for training.

A Judge of the United States District Court for the Northern District of Ohio, Eastern Division, to whom the case was tried, rejected the defendant's constitutional defense and his evidence bearing on alternatives to the draft, including speeches of members of Congress, a study by the Defense Department of the draft selection system, the expert testimony of an economist, and testimony by an Assistant Secretary of Defense before the House Committee on Armed Services. All of this, appellant asserted, would demonstrate that the manpower needs of the United States could have been satisfied by a wholly voluntary system on the date in question, February 4, 1964. The remedy sought is for the case to be remanded to the trial court for a new trial, with direction to permit the defendant to subpoena in advance of trial relevant studies in the hands of the government and to place in evidence data bearing on the issue of the necessity for the draft. The trial judge would then, upon his evaluation of the evidence, determine whether or not conscription was reasonably necessary at the time of the defendant's alleged offense, and if not, would acquit the defendant on the ground that such lack of necessity rendered the draft law unconstitutional.

Appearing as amicus curiae, the American Civil Liberties Union urges on behalf of appellant that he should have "the right to attempt to prove unconstitutionality." On page 2 of its brief it is stated:

"Amicus takes no position on the merits of the constitutional argument. We do not argue that the draft, on February 4, 1964, or on any other day, was constitutional or unconstitutional. * * *

"Amicus does urge, however, that appellant should have had the right to challenge its constitutionality, which right was denied by the trial court's action in quashing subpoenas, denying motions for subpoenas, and refusing to hear relevant testimony in support of the claim of unconstitutionality. Accordingly, amicus' position here is essentially procedural."

We could agree that a litigant charged with disobedience of a Congressional Act should have "the right to attempt to prove unconstitutionality" of the Act in question. But if the evidence proffered to prove unconstitutionality would not in its totality and under a view most favorable to the defendant, prove unconstitutionality, the trial judge does not have to receive it. Appellant claims no other support for his challenge to the constitutionality of the draft law than the asserted fact that on February 4, 1964, the day he refused to report for induction, the national defense could as well, or better, have been served by an army made up of volunteers, attracted to military service by better pay and better living conditions. He argues that had this system of providing for the national defense been in effect on or before the day appellant refused induction, February 4, 1964, there would have been no need to draft appellant Butler— therefore, to do so was an unconstitutional deprivation of his liberty. Stated in the language of appellant's statement of questions involved, his position is:

*"The claim of lack of necessity* is founded on the proposition that at the time the defendant was ordered to be inducted, February 4, 1964, the military manpower procured by the draft

*could have been* procured by voluntary means if incentives for enlistment had been improved, in the form chiefly of higher pay and better opportunities for training and education." (Emphasis added.)

In its amicus brief, the American Civil Liberties Union states the question as follows:

"Is compulsory military service such a deprivation of individual liberty that the constitutional guarantee of due process under the Fifth Amendment *must permit a defendant who refuses to submit to induction to challenge the constitutional validity of the induction order on the grounds that at the time he refused to submit there was no overriding need of national security which could not be satisfied through less onerous means?"* (Emphasis added.)

Appellant does not claim that an army of the size then under arms was not necessary for the national defense on February 4, 1964, the day of his alleged offense. The army was brought into being by voluntary enlistments, and by employment of the Universal Military Training and Service Act. The charge is that Congress should not have adopted conscription as one of the means of maintaining the needed army; it is not claimed that voluntary enlistments under the system then in force did provide, or could have provided, such an army. In his brief's address to us, appellant makes clear his position as follows:

"First of all we must make it clear that *it is not suggested that the military forces of the United States were not needed or should have been smaller, less well trained, or less effective than they were in the period of the defendant-appellant's refusal of induction.* Indeed what is sought to be proved is that by improved pay and other incentives and by certain reasonable adjustments of organization, armed forces fully voluntary but at least equally effective and probably better trained and more efficient could have been provided. And if Congress

had determined to preserve the Selective Service System as a stand-by mechanism for rapid increase of military manpower in event of necessity, that would not militate against the appellant's defense." (Emphasis added.)

At another place, the appellant states his position in this way:

"*Appellant does not question the existence of the power to conscript when it is necessary.* We question only whether it was necessary at the time of the defendant-appellant's alleged violation of the Act." (Emphasis added.)

And in its amicus brief, the ACLU quotes from its January 30, 1966, statement of policy on "Military Conscription":

"How can this statement of position be applied realistically in the context of the present draft system? *At the moment we see no constitutional, legal challenge that can be brought against conscription* per se or the monthly draft calls, but it is possible that an individual case may arise which might bring a civil liberties issue into focus. The major thrust, therefore, *must come in the legislative forum,* an appropriate arena for debate on the need for a particular conscription."

We have read the appellant's exposition of the content of his proffered evidence. It consisted in the main of various statements by members of Congress, some excerpts from reports of studies made by the Department of Defense, and evidence that would have been given by an expert witness. Giving this data a view most favorable to appellant's defense, it was to the effect that Congress could have found a better way to raise an admittedly needed army than the system in force at the time appellant refused to report for induction. The Appellant's brief summarizes his proffered evidence as follows:

"It is clear that there is a substantial body of opinion among the members of Congress who have studied the draft that it would be highly desirable to abolish it and to rely upon a wholly volunteer force. None of them wants

to weaken nor undermine the strength or quality of our national defense in the process, *and none states a firm conclusion that the draft can be abolished and a wholly volunteer force can be maintained at reasonable cost.* (Emphasis added.)

"However, many of them point out that whatever increase in cost there might be in raising salaries in the armed forces to attract more volunteers would be at least partially offset by the economics of reducing turnover and thus reducing training cost, employing civilians or civilian contractors to perform more of the administrative and supply functions, delegating to civilian institutions the teaching of skills needed by the military that have civilian counterparts, and improving the efficiency of military operations in other respects, such as by fitting assignments to abilities more closely.

"Many of the members of Congress point out that incentives other than increased pay can also be used to help attract volunteers. Among the suggestions are improved opportunities for education and the learning of job skills before, during and after military service; and improved recruiting and public relations activities.

"Many of the Congressmen believe it likely that by combining monetary and non-monetary incentives the increased costs of a wholly voluntary force could be kept within the limit of the savings that it and other economies could bring about, or at least that the net increase in cost would be modest."

The *better* alternative to the draft would consist primarily in raising the pay of the soldiers. One of the quoted Congressmen stated:

"Improvement in salary, living conditions, training, retirement benefits, opportunities for travel, and social status would make military service more attractive. It is clear that *at some level of expenditure* the armed services can attract all the men with the skills they need to keep our fighting machine in top shape. *The cost is not clear.*" (Emphasis added.)

Another of the Congressmen, advocating that one day we might get along with a totally voluntary system, said:

"During the Vietnam conflict a voluntary system is not feasible but we can pursue the goal."

To like effect, another stated, on June 28, 1966:

"We are now in an international crisis. No doubt the status of our existing military forces requires the draft."

A report of an Assistant Secretary of Defense on a study of the draft undertaken by the Department of Defense in April, 1964, contained the following:

"A major objective of the study was to assess the possibility of meeting our military manpower requirements on an entirely voluntary basis in the coming decade. * * *

"We found that elimination of the draft with no new incentives would make it impossible to sustain force levels of the size required *during the past sixteen years.*

"The cost of sustaining an adequate all volunteer force would be prohibitive. The responses of the 16 to 19 year old group reveal that without a draft equal pay would be an adequate incentive to induce enlistment for only 4%. Considerably higher pay than in civilian life would induce enlistment by another 17%.

* * * * * *

"In summary, it is *theoretically* possible to 'buy' an all-voluntary force at a cost ranging up to $17 billion, *depending upon unemployment conditions.* Other changes and techniques do not appear collectively to be able to meet the deficit anticipated under an all-voluntary force." (Emphasis added.)

There were some stronger expressions of support for an all-voluntary army than what we have set out above. However, appellant's own summing up of the opinions he relies on says, "*none* states a firm conclusion that the draft can be abolished

and a wholly volunteer force can be maintained at reasonable cost."

Arrayed against this evidence which appellant proffered, is the statutory declaration by the Congress that "an adequate armed strength must be achieved and maintained to insure the security of this nation," and that:

"The Congress further declares that in a free society the obligations and privileges of serving in the armed forces and the reserve components thereof should be shared generally, in accordance with a system of selection which is fair and just, and which is consistent with the maintenance of an effective national economy." Title 50, U.S.C. App. § 451(c).

Congress then goes on to implement its declaration of need and purpose by enacting provisions for the draft as "a system of selection which is fair and just." The entirety of the provisions of the Universal Military Training and Service Act, 50 App.U.S.C. § 451 et seq., are but Congressional expression of its legislative judgment as to the need for the law it enacted.

We read, then, appellant's position to be that an issue of fact should be framed between his proffered evidence and the judgment of the Congress as to the necessity of the draft; this issue would then be submitted to a United States District Judge; the District Judge would have the power, upon his own evaluation of the evidence, to conclude that there was a better method of providing for the needed national defense than the one chosen by the national legislature. From this position he would move on to conclude that the availability of this better way rendered unnecessary and *therefore unconstitutional*, the method chosen by Congress.

■■ We do not think the District Judge had any such power, and we agree with his refusal to entertain the contest presented by appellant. We affirm the judgment of the District Court.

■ We think that our conclusion so easily emerges from the foregoing recital that it requires little support from fresh dissertation and repetition of familiar law. We may concede that the Supreme Court has said that the war powers of Congress must be exercised within "Constitutional limitations." Hamilton v. Kentucky Distilleries & Warehouse Company, 251 U.S. 146, 156, 40 S.Ct. 106, 64 L.Ed. 194, 199 (1919); Galvan v. Press, 347 U.S. 522, 530, 74 S.Ct. 737, 98 L.Ed. 911, 921 (1954). We observe that in *Galvan* the assertion of judicial power to control Congress' exercise of its war powers was dictum and in *Kentucky Distilleries,* the Supreme Court found no fault in the Congressional action there involved. We are cited to no case, nor does our research yield a case, that would support the proposition urged on us here, to wit: that a court has the power to review the decisions of the executive and the national legislature as to how to provide for the national defense, because the court thinks that it might be *possible* or *probable* that an all-voluntary army could be obtained by offering more pay and other perquisites to voluntary soldiers.

■ We think it sufficient to cite and quote from the following authorities: In the Selective Draft Law Cases, (Arver v. United States) 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918), the Court, in holding conscription a valid exercise of Congressional power, said:

"The possession of authority to enact the statute must be found in the clauses of the Constitution giving Congress power 'to declare war; * * * to raise and support armies, but no appropriation of money to that use shall be for a longer term than two years; * * * to make rules for the government and regulation of the land and naval forces.' Article 1, § 8. And of course the powers conferred by these provisions, like all other powers given carry with them as provided by the Constitution the authority 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.' Article I, § 8." 245 U.S. at 377, 38 S.Ct. at 161, 62 L.Ed. 353.

■ It is suggested by appellant that even though the Act now challenged was constitutional when enacted, the District Judge could, upon the evidence we have reviewed above, determine that its constitutional validity did not remain to the date of appellant's disobedience of it. A like contention was made in the *Kentucky Distilleries* case. The Court replied:

"No principle of our constitutional law is more firmly established than that this court may not, in passing upon the validity of a statute, inquire into the motives of Congress. (citations omitted) Nor may the court inquire into the wisdom of the legislation. (citations omitted) *Nor may it pass upon the necessity for the exercise of a power possessed,* since the possible abuse of power is not an argument against its existence. Lottery Case, [Champion v. Ames,] 188 U.S. 321, 363 [23 S.Ct. 321, 47 L.Ed. 492]." 251 U.S. at 161–162, 40 S.Ct. at 110, 64 L. Ed. 202.

The Court then explained Perrin v. United States, 232 U.S. 478, 486, 34 S.Ct. 387, 58 L.Ed. 691, and Johnson v. Gearlds, 234 U.S. 422, 446, 34 S.Ct. 794, 58 L.Ed. 1383, cases which had conceded arguendo that valid Acts of Congress may become invalid after enactment due to changed circumstances. Noting that the Acts were in both instances upheld, the Court said that "In each case the decision rested upon the ground that the question of what was reasonably essential * * * was one primarily for the consideration of the lawmaking body; that Congress was invested with a wide discretion; and that its action, unless purely arbitrary, must be accepted and given full effect by the courts." 251 U.S. at 163, 40 S.Ct. at 111, 64 L.Ed. 202. It went on to say:

"Conceding, then, for the purposes of the present case, that the question of the continued validity of the War Prohibition Act under the changed circumstances depends upon whether it appears that there is no longer any necessity for the prohibition of the sale of distilled spirits for beverage purposes, it remains to be said that, *on obvious grounds, every reasonable intendment must be made in favor of its continuing validity, * * * that to Congress in the exercise of its powers, not least the war power upon which the very life of the nation depends, a wide latitude of discretion must be accorded*; and that it would require a clear case to justify a court in declaring that such an act, passed for such a purpose, had ceased to have force because the power of Congress no longer continued. (Emphasis added.) 251 U.S. at 163, 40 S.Ct. at 111, 64 L.Ed. at 202–203.

In the case of Bertelsen v. Cooney, 213 F.2d 275 (5th Cir. 1954), a doctor challenged the constitutionality of the section of the Universal Military Training Act authorizing the President to require special registration for military duty of doctors, dentists, and allied specialists. He contended the Act was unconstitutional because, *inter alia,* doctors were *not needed for present uses,* but only to create a future pool, because there were *already sufficient doctors* in the Medical Reserve Corps, and because *"the war powers of Congress are proportionate to the necessity for their exercise," and that they had been exercised in excess of such necessities.* Finally, he maintained that "the Act is 'arbitrary, unreasonable and unnecessary' in its provisions and enforcement to such an extent as to deny appellant due process under the Fifth Amendment." Id. at 276. The Court answered:

"Petitioner concedes, as indeed he must in the light of the adjudicated cases, that under Art. I, sec. 8, of the Constitution, Congress has the power to raise and support armies, to maintain a Navy, and to draft personnel for service therein. This power exists in peace time as well as in war. *The power is plenary. It is not for the judiciary to review the legislative branch on the question of what military strength is necessary for the safety of the Nation, nor how the forces shall be raised, nor of what elements they shall be composed. These matters are confided to Congress and its agencies.* United States ex rel. Goodman v. Hearn; 5

Cir., 153 F.2d 186; United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302; Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305; United States v. Henderson, 7 Cir., 180 F.2d 711; United States v. Cornell, D.C., 36 F.Supp. 81; Warren v. United States, 10 Cir., 177 F.2d 596; Bronemann v. United States, 8 Cir., 138 F.2d 333."

\* \* \* \* \* \*

"[I]t was never intended to limit the war powers of Congress nor its right to exact public service from all when necessary to meet the public need, *Congress being the sole judge of the necessity and extent thereof.* Heflin v. Sanford, 5 Cir., 142 F.2d 798. Congress is expressly authorized to declare war and to provide for the common defense. These powers necessarily carry with them the power to say *who shall serve in the armed forces,* and in what circumstances." Id. at 276–278. (Emphasis added.)

We will not lengthen this opinion with further citations,[1] except to conclude with this observation of Chief Justice John Marshall in McCulloch v. State of Maryland, 4 Wheat. 316, 421, 423, 4 L.Ed. 579, 605–606, (1819):

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

\* \* \* \* \* \*

"But where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such power."

Judgment is affirmed.

---

1. Interesting reading may be provided by recent articles in the American Bar Association Journal entitled "The Amazing Case of Kneedler v. Lane" and "A Judicial Revisitation Finds Kneedler v. Lane Not So 'Amazing'" appearing respectively, in the August and the December, 1967, issues of the Journal.