**Michael Waldo SIMMONS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 25371.

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1969.

Rehearing and Rehearing En Banc
Denied March 10, 1969.

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., for appellant.

Charles L. Goodson, U. S. Atty., Charles B. Lewis, Jr., Asst. U. S. Atty., Atlanta, Ga., for appellee.

Before WISDOM and AINSWORTH, Circuit Judges, and JOHNSON, District Judge.

AINSWORTH, Circuit Judge:

Appellant was convicted for violation of the Universal Military Training and Service Act, 50 U.S.C. App. § 462(a),[1] sometimes hereinafter referred to as "the Act," in that he failed to comply with an order of his local selective service board to report for and submit to induction into the armed forces of the United States.[2] Upon consideration of the numerous objections made by the appellant, we affirm the verdict rendered in the district court.

The appellant's selective service file reveals that he was reclassified I–A on November 4, 1965, by his local draft board in Philadelphia, Pennsylvania, and subsequently ordered to report for a physical examination to be performed on December 14, 1965. On December 6, 1965, the appellant filed a "Notice of Change of Address," listing Atlanta, Georgia, as his new place of residence, but he did not request a transfer to a Georgia selective service board. Thereafter, there occurred an incredible series of events in which the appellant continually flouted orders to report for physical examination on no less than seven occasions. The appellant failed to report in Philadelphia on December 14, 1965, February 9, 1966, and March 16, 1966. On March 15, 1966, he requested a transfer to an Atlanta draft board, for purposes of a physical examination, and on March 24, 1966, this transfer was granted. Subsequently, appellant failed to report for

physical examinations in Atlanta on April 8, 1966, May 6, 1966, and May 20, 1966. Instead of reporting on May 20, 1966, the appellant sent a telegram to the Atlanta draft board from Philadelphia, informing them that he was presently in Philadelphia and that he would communicate with the Philadelphia board. Subsequently, the Philadelphia board ordered him to report on May 25, 1966, for a physical examination. Appellant arrived late for this examination, and it could not be performed at that time. Finally, the appellant was physically examined in Philadelphia on June 3, 1966, and later ordered to report for induction. A request for transfer to the Atlanta board for purposes of induction was granted, and the appellant was ordered to report at Atlanta to be inducted on August 18, 1966.

The events of August 18, 1966, are disputed and confused. The appellant arrived at the Induction Center in Atlanta before the hour designated for reporting, and joined a group picketing the Center, presumably as a protest against the war in Vietnam. At approximately the appointed hour the appellant ceased picketing the Center, and attempted to gain admission to the Induction Center. Here, however, the appellant's version of what transpired greatly differs from the testimony of the Government's witnesses. The appellant testified that he informed the military personnel at the door that he

1. The subsection referred to reads in pertinent part:
"Any member of the Selective Service System or any other person charged as herein provided with the duty of carrying out any of the provisions of this title * * *, or the rules and regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty, * * * shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment, * * *."

2. Selective Service Regulations provide that

"When the local board mails to a registrant an Order to Report for Induction * * *, it shall be the duty of the registrant to report for induction at the time and place fixed in such order. If the time when the registrant is ordered to report for induction is postponed, it shall be the continuing duty of the registrant to report for induction upon the termination of such postponement * * *. Regardless of the time when or the circumstances under which a registrant fails to report for induction when it is his duty to do so, it shall thereafter be his continuing duty from day to day to report for induction * * *."
32 C.F.R. § 1632.14(a).

was presenting himself for induction. Conversely, Sergeant Gilliam testified that the appellant told him that he wished to speak to someone in command about a water-throwing incident at the Induction Center on the previous day, and that the appellant did not present any induction papers or inform him that he was there for the purpose of being inducted. As a consequence, the appellant was not admitted; rather, he resumed picketing, again attempted to gain admission on three or four separate occasions, and upon each denial, he rejoined his comrades on the picket line. Thus, to believe the appellant, the events at the Induction Center formed a farcical and incongruous scenario in which the appellant played both the willing inductee and the spirited protester.

However strenuous appellant's efforts to enter the Induction Center, these efforts were ended when he was arrested by police officers, charged with disobeying an officer, and sentenced to three months in the Fulton County Jail. He was released on October 14, 1966, and according to the appellant's testimony, he reported to the Induction Center on the next business day, but was again denied admission. Thereafter, on May 16, 1967, the appellant was indicted for violation of the Universal Military Training and Service Act.

I.

The appellant makes a broad-based attack on the constitutionality of the Act, asserting that compulsory service can be justified only by extreme necessity and that the power of Congress to raise and support armies in peacetime is subject to the Bill of Rights. That this court is not competent or empowered to sit as a super-executive authority to review the decisions of the Executive and Legislative branches of government in regard to the necessity, method of selection, and composition of our defense forces is obvious and needs no further discussion. United States v. Butler, 6 Cir., 1968, 389 F.2d 172; Bertelsen v. Cooney, 5 Cir., 1954, 213 F.2d 275. "The Congressional power to provide for the draft does not depend upon the existence of a war or national emergency, but stems also from the Constitutional power to raise and support armies and to provide and maintain a navy." United States v. Hogans, 2 Cir., 1966, 369 F.2d 359, 360 (per curiam). See also United States v. Henderson, 7 Cir., 1950, 180 F. 2d 711; Muhammad Ali v. Connally, S.D. Tex., 1967, 266 F.Supp. 345. See Arver v. United States, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918); United States v. Bolton, 2 Cir., 1951, 192 F.2d 805 (per curiam). While it is true that the war power, and presumably the power to raise armies in peacetime, is subject to constitutional limitations, Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 156, 40 S.Ct. 106, 108, 64 L.Ed. 194 (1919) (Mr. Justice Brandeis),[3] considerations of national defense may render lawful what would be unlawful in a different context. See Toyosaburo Korematsu v. United States, 323 U.S. 214, 224–225, 65 S.Ct. 193, 198, 89 L.Ed. 194 (1944) (Mr. Justice Frankfurter, concurring).[4] Thus, on this basis, we find no constitutional infirmity in the Universal Military Training and Service Act. Etcheverry v. United States, 9 Cir., 1963, 320 F.2d 873, 874; United States v. Richmond, C.D.Cal., 1967, 274 F.Supp. 43; Arver v. United States, supra. However, appellant mounts one further constitutional assault on the Act. He alleges that the existence of student deferments is a discriminatory and arbitrary classification unrelated to the purposes of the Act. While obviously such deferments may have the collateral effect of discrimi-

3. See also Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 110, 63 S.Ct. 1375, 1390, 87 L.Ed. 1774 (1943) (Mr. Justice Murphy, concurring).

4. See Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 149, 71 S.Ct. 624, 637, 95 L.Ed. 817 (1951) (Mr. Justice Frankfurter, concurring).

nating against those who are not wealthy enough or bright enough to attend college, this classification is reasonable in light of the public policy in favor of an educated population. Compare United States v. Holmes, 7 Cir., 1967, 387 F.2d 781. See Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Glona v. American Guarantee & Liability Insurance Co., 5 Cir., 1967, 379 F.2d 545; Gruenwald v. Gardner, 2 Cir., 1968, 390 F.2d 591.

## II.

■■ The appellant urges that the United States' participation in the war in Vietnam is in violation of various treaties, Articles 2(4) [5] and 33(1) [6] of the United Nations Charter, and the norms of international behavior, and that hence his induction would force him to become a party to war "crimes." Initially, "It is difficult to think of an area less suited for judicial action" than the conduct of the foreign policy of this nation. Luftig v. McNamara, 1967, 126 U.S.App. D.C. 4, 373 F.2d 664, 665–666. We are unable to find any constitutional authority for such interference by the judiciary in matters charged exclusively to the Congress and the Executive. Luftig v. Mc-Namara, supra.[7] See generally Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (Mr. Justice Harlan). Moreover, the appellant assumes that induction into the armed forces and participation in the Vietnam War are synonymous, and this is clearly not the case. Judge Medina of the Second Circuit in United States v. Mitchell, 2 Cir., 1966, 369 F.2d 323, 324, cogently articulated this difference and its impact on one asserting the war "crimes" argument:

"Regardless of the proof that appellant might present to demonstrate the correlation between the Selective Service and our nation's efforts in Vietnam, as a matter of law the congressional power 'to raise and support armies' and 'to provide and maintain a navy' is a matter quite distinct from the use which the Executive makes of those who have been found qualified and who have been inducted into the Armed Forces. Whatever action the President may order, or the Congress sanction, cannot impair this constitutional power of the Congress.

"Thus we need not consider whether the substantive issues raised by appellant can ever be appropriate for judicial determination. See United States v. Hogans [1966] 2 Cir., 369 F.2d 359 * * *."

See also United States v. Bolton, 2 Cir., 1951, 192 F.2d 805 (per curiam).

## III.

■■ The appellant alleges that Negroes, women, members of his age group, and persons in lower economic brackets were deliberately excluded from the local draft boards and appeals boards processing his case, and that hence his prosecution should be "abated" pending reform of the Selective Service System. This argument is foreclosed by the decision of this court in Clay v. United States, 5 Cir., 1968, 397 F.2d 901, 911:

"No court has held, so far as we can determine, nor do we here, that a Negro registrant for selective service is

5. Article 2(4) reads as follows:
"All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations."

6. Article 33(1) reads as follows:
"The parties to any dispute, the continuance of which is likely to endanger the maintenance of international peace and security, shall, first of all, seek a solution by negotiation, enquiry, mediation, conciliation, arbitration, judicial settlement, resort to regional agencies or arrangements, or other peaceful means of their own choice."

7. See United States v. Butler, 6 Cir., 1968, 389 F.2d 172.

entitled to be classified and inducted by a selective service board composed of a percentage of Negro members which the Negro population bears to the total population, or that a board lacks jurisdiction of a registrant unless so constituted. * * * We do not justify the failure to include substantial numbers of Negroes on such boards. The Selective Service System must not only be fair, it must likewise have the appearance of fairness. Negro draftees should be selected for military service by a system which gives Negro citizens a full participation in the selection process. * * * But nothing we have said justifies exemption from service in the armed forces for Negro registrants."

See also Nelloms v. United States, 5 Cir., 1968, 399 F.2d 295; Sellers v. McNamara, 5 Cir., 1968, 398 F.2d 893; Haven v. United States, 9 Cir., 1968, 403 F.2d 384.

## IV.

Appellant attacks the denial of his motion to dismiss the indictment on the ground that there was racial discrimination in regard to the composition of the jury wheel from which prospective jurors were selected. In United States v. Tillman, N.D.Ga., 1967, 272 F.Supp. 908, 910–912, Judge Smith succinctly explained the method by which jurors were chosen in the Atlanta Division:

"In brief, the court provided for the selection of every 50th name (or 2%) on the voter registration lists of each county in the Atlanta Division to be mailed questionnaires. The jury questionnaires were properly mailed, with a return of 50–60 per cent. Only those persons were disqualified by the Clerk and Jury Commissioner whose answers stated that they had not attained the age of 21 years; or had been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year; or they could not read, write, speak and understand the English language; or they had a mental or physical infirmity which would prevent them from rendering efficient jury service (except that all females over 70 and all males over 75 were disqualified). * * * On this basis, approximately 90% of persons returning questionnaires were found qualified, and *all* persons not disqualified were placed in the jury wheel."

The net result of this jury selection procedure was that 15.77% of the persons whose names were in the jury wheel were Negroes, whereas Negroes comprised 20.48% of the population of the Atlanta Division, if we assume that the 1960 census figures are still accurate. Thus, it is appellant's theory that the disparity in percentages between the Negro proportion of the population at large and the Negro proportion of prospective jurors fatally taints his conviction.

"It is well settled that Negroes may not be systematically and arbitrarily excluded from the jury venires from which the grand jury is selected which has indicted a Negro defendant and that a conviction cannot stand if the petit jury is drawn from a list similarly composed." Mobley v. United States, 5 Cir., 1967, 379 F.2d 768, 770. See also Swain v. State of Alabama, 380 U.S. 202, 203–204, 85 S.Ct. 824, 826, 13 L.Ed.2d 759 (1965), and cases cited therein; Sims v. Georgia, 389 U.S. 404, 407–408, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967) (per curiam); Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed. 2d 599 (1967); Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); Chance v. United States, 5 Cir., 1963, 322 F.2d 201, 203; Hansen v. United States, 8 Cir., 1968, 393 F.2d 763, 766; Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Case, 80 Harv.L.Rev. 338, 340–341 (1966). However, neither the jury wheel nor the venire need precisely conform to the proportionate strength of each identifiable group in the total population. Swain v. State of Alabama, 380 U.S. at 208, 85 S.Ct. at 829. See also Mobley v. United States, 379 F.2d at 771–772; Comment, The Fifth Circuit: New History for an Old Problem—

Jury Selection, 1 Ga.L.Rev. 674, 680 (1967). It is sufficient, according to the traditional formulation, if jurors are "drawn from a fair cross-section of the community." Mobley v. United States, supra at 771. See also Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L. Ed. 84 (1940); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Scott v. Walker, 5 Cir., 1966, 358 F.2d 561, 564; Chance v. United States, 5 Cir., 1963, 322 F.2d 201, 204–205; United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 224 (Judge Learned Hand); Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34, 57, and cases cited therein. See Note, The Defendant's Challenge to a Racial Criterion in Jury Selection: A Study in Standing, Due Process and Equal Protection, 74 Yale L.J. 919, 923–924 (1965). The determination of what is a fair cross-section depends upon the facts of each case, and under the circumstances herein presented, we find that the underrepresentation of Negroes in the jury wheel in comparison with their share of the total population was not of such magnitude as to warrant overturning the appellant's conviction.[8]

Aside from our holding that the appellant was convicted by a jury drawn from a fair cross-section of the community, it is significant to note that the use of voter registration lists from which to select prospective jurors is not per se illegal. Gorin v. United States, 1 Cir., 1963, 313 F.2d 641, 644; Chance v. United States, 322 F.2d at 203. Congress approved use of voter registration lists as the principal source of names of prospective jurors when it recently enacted the Jury Selection and Service Act of 1968 (28 U.S.C. § 1861 et seq.),[9] an act designed to provide impartial jurors to be selected at random from a fair cross-section of the community where the court convenes.[10]

Prior to the enactment of Section 1863, the Committee on the Operation of the Jury System of the Judicial Conference

8. Compare Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824 (1965) (Male Negroes constitute 26% of all males in the county, but only constitute 10 to 15% of jury panels. System of selection held to be "imperfect" but still lawful.), and Chance v. United States, supra (Negroes constitute 12% of population, but only 10% of names in jury box. Held lawful.), with Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523 (1967) (per curiam) (Negroes constitute 24.4% of taxpayers, but only 4.7% of those on grand jury list, and only 9.8% of traverse jury list. System of selection held unconstitutional.). See also Hunt v. United States, 5 Cir., 1968, 400 F.2d 306.

9. Pertinent to this discussion are several provisions of the new Jury Selection Act, which read as follows:

"§ 1861. Declaration of policy

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community * * *.

"§ 1862. Discrimination prohibited

"No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status.

"§ 1863. Plan for random jury selection

"(a) Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives * * * of this title * * *.

"(b) Among other things, such plan shall—

* * * * *

"(2) specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division. The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by * * * this title."

10. The legislative history of the Act is found in Senate Report No. 891, 90th Cong., 1st Sess. dated December 6, 1967 (to accompany S. 989), and House of Representatives Report No. 1076, 90th Cong., 2d Sess. dated February 6, 1968 (to accompany S. 989).

of the United States, of which Judge Irving R. Kaufman of the Second Circuit is chairman, drafted legislation whereby jurors would be selected at random from voter registration lists, and this recommendation formed the basis for the Jury Selection and Service Act of 1968. (See 42 F.R.D. 353.) [11] After our decision in *Rabinowitz,* supra, the Atlanta Division of the United States District Court for the Northern District of Georgia, in the summer and fall of 1966, revised its jury selection system (the new system being in effect at the time of the trial of the present case), and the Administrative Office of the United States Courts on January 27, 1967, distributed a description of the Atlanta System to each United States District Court in the United States as a recommended solution to the problem of selection of jurors. See United States v. Tillman, N.D.Ga., 1967, 272 F.Supp. 908, 915, n. 10 (Smith, J.). Thus, "the best thought of all three branches of govern-

ment points toward voter registration lists as representing 'the best cross-section of the community; indeed, they are probably the most broadly based lists available.'" Ibid. Compare Grimes v. United States, 5 Cir., 1968, 391 F.2d 709, where we recently approved random selection of names from voter registration lists as the sole source of names for jury duty in a case involving the United States District Court for the Middle District of Georgia, Macon Division. No significant improvement in our nation's federal judicial machinery has ever met such unanimity of opinion as to its importance and propriety as has adoption by the Congress of the system of jury selection at random from voter registration lists.

## V.

The appellant urges that the trial judge erred in charging the jury that he had a continuing duty to report for induction between August 18, 1966, the date on which he was ordered to report, and his indictment on May 16, 1967.

---

11. The Judicial Conference of the United States had given its approval to the Kaufman Committee's draft and the principle of random selection of jurors from voter registration lists at the March 1967 meeting in Washington, D. C. The following from the reports of proceedings of the Conference meeting is pertinent:

"Judge Kaufman reported that pursuant to the authorization of the [Judicial] Conference at its September 1966 session * * *, a subcommittee was appointed to study the mechanics of the several proposals relating to both federal and state methods of selection of juries subject to the principle endorsed by the Conference of random selection of jurors in a manner which would produce a fair cross-section of the community in the district or division in which the court is held. As a result of the work of the subcommittee and subsequently of the full committee, he presented to the Conference for consideration and the Conference approved a draft of a bill to assure nondiscrimination in federal and state jury selection and service.

"Title 1 of the draft bill * * * provides for the random selection of jurors. Voter lists are to be used as the source of prospective jurors except

in a few jurisdictions where voter lists do not represent a fair cross-section of the community."

Reports of the Proceedings of the Judicial Conference of the United States, 1967, pp. 41–42. See also Report of the Proceedings of the Judicial Conference of the United States, 1966, p. 67. At the September 1967 meeting of the Judicial Conference of the United States, the Conference directed the Administrative Office to communicate with the Chief Judges of the United States District Courts which had heretofore utilized the "key man" jury selection system to ascertain whether such districts have since adopted "a system of random selection" in a manner that would produce a fair cross-section of the community in the district or division in which court is held. The Conference resolved further that it is desirable that those courts which have not already done so should convert as soon as possible from the key man system to the random system.

See Reports of the Proceedings of the Judicial Conference, 1967, p. 81.

Accordingly, such a letter from the Administrative Office was sent to the Chief Judges of the United States District Courts on September 26, 1967.

We do not agree. The Selective Service Regulations provide that

> "Regardless of the time when or the circumstances under which a registrant fails or has failed to report for induction * * *, it shall thereafter be his continuing duty from day to day to report for induction * * * to his own local board, and to each local board whose area he enters or in whose area he remains."

32 C.F.R. § 1642.15. See Kariakin v. United States, 9 Cir., 1958, 261 F.2d 263, 266. While the indictment charges only one offense, this regulation makes that offense "a continuing offense," and "There was no error in so instructing the jury." Silverman v. United States, 8 Cir., 1955, 220 F.2d 36, 39. Graves v. United States,[12] 9 Cir., 1958, 252 F.2d 878, is distinguishable because in that case the defendant was advised by board officials that it was too late to report after an initial failure to do so, and, furthermore, the defendant did not receive his notice of induction until after he was due to report.

### VI.

 Finally, the jury's verdict is attacked on the ground that there was insufficient evidence to sustain the conviction. Of course, the verdict must be sustained if, viewed in a light most favorable to the Government,[13] there was substantial evidence to support it. Pardo v. United States, 5 Cir., 1966, 369 F.2d 922, 926, and cases cited therein; Moorman v. United States, 5 Cir., 1968, 389 F.2d 27, 32. Substantial evidence means "relevant evidence acceptable to a reasonable mind as adequate to support a conclusion." Ibid. We find, after a careful review of the record, that there was substantial evidence from which the jury could conclude that the appellant knowingly failed to perform a statutory duty. Davis v. United States, 5 Cir., 1967, 374 F.2d 1, 5. See Graves v. United States, 9 Cir., 1958, 252 F.2d 878, 881; Silverman v. United States, 8 Cir., 1955, 220 F.2d 36, 39–40; Smith v. United States, 4 Cir., 1945, 148 F.2d 288; United States v. Hoffman, 2 Cir., 1943, 137 F.2d 416; United States v. Collura, 2 Cir., 1943, 139 F.2d 345 (per curiam); United States v. Mitchell, D.Conn., 1965, 246 F.Supp. 874, affirmed, 2 Cir., 1966, 369 F.2d 323. The facts in regard to events at the Induction Center on August 18, 1966, were in dispute, the appellant's credibility was at issue in regard to whether he reported after his release from the County Jail, and, in the light of appellant's numerous prior defaults in obeying selective service orders, there is sufficient evidence to uphold appellant's conviction. Pardo v. United States, 369 F.2d at 926; Moorman v. United States, 389 F.2d at 32. Compare Whitney v. United States, 5 Cir., 1964, 328 F.2d 888; United States v. Lewis, E.D.Wis., 1967, 275 F.Supp. 1013. As this court stated in Moorman v. United States, 389 F.2d at 32:

> "Appellant was given every opportunity to comply with the Selective Service law and failed on five separate occasions to report as ordered for physical examinations and finally for induction. The evidence shows that his excuses for failure to report were weak, unsupported and without merit."

See also Pardo v. United States, 369 F.2d at 926.

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

12. Compare also Venus v. United States, 9 Cir., 1960, 287 F.2d 304, reversed, 368 U.S. 345, 82 S.Ct. 384, 7 L.Ed.2d 341 (1961) (per curiam opinion citing Ward v. United States, 1953, 344 U.S. 924, 73 S.Ct. 494, 97 L.Ed. 711).

13. Peters v. United States, 5 Cir., 1967, 376 F.2d 839; Moorman v. United States, 5 Cir., 1968, 389 F.2d 27, 32.